# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

**FILED**

OCT 0 6 2017

U.S. CLERK'S OFFICE
INDIANAPOLIS, INDIANA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *Plaintiff-Respondent* | ) | |
| v. | ) | Crim 1:11-CR-00042-JMS-DML |
| | ) | |
| Timothy S. Durham | ) | Civ. No. _____ |
| *Defendant-Movant* | ) | |
| | ) | |
| | ) | **1:17**-cv- **3590** JMS -DML |

---

## Brief in Support of Motion to Vacate

## Conviction and SentencePursuant to 28 U.S.C. § 2255

---

I. Procedural history.

On November 24, 2009, the FBI raided the offices of Fair Finance Company ("Fair") in Akron, Ohio and Obsidian Enterprises, Inc. in Indianapolis, Indiana. Both companies were controlled by Timothy S. Durham, petitioner herein. The FBI proclaimed to the national and local media that Fair was a "ponzi" scheme. Simultaneously the government filed a civil forfeiture suit of all of Fair's and

Obsidian's bank accounts and certain of Durham personal assets. Apparently realizing their mistake and that Fair was not a ponzi scheme, the government dismissed the forfeiture suit. On the same day as the raid, Fair had filed a new authorization request with the Ohio Department of Securities ("ODS") to obtain a renewal of its authorization to continue selling investment certificates to Ohio residents. Shortly after the raid, Fair withdrew its authorization request and Fair was forced into involuntary bankruptcy and a forced liquidation of its assets.

On March 15, 2011, a grand jury in the Southern District of Indiana returned a twelve count indictment charging Durham, Cochran and Snow with securities fraud, wire fraud, and conspiracy. The government alleged that Durham and his co-defendants had misrepresented the financial condition and use of proceeds of Fair. The government contended that in 2004 and 2005, the defendants had overvalued some of Fair's loan receivable assets because Fair's accountants had concluded that the tangible asset values of the Fair borrowers and other supplemental tangible assets were not sufficient to collaterally cover the loans. The government made similar allegations regarding certain of Fair's November 2009 valuations. Thus, the government maintained that Fair's loans were not properly reserved or impaired and its financial statements were overstated. The government also contended that during a few calls and meetings with a handful of investors, the defendants had misrepresented the liquidity and financial condition of Fair in 2009. Further, the

2

government contended that the defendants did not orally disclose the use of proceeds that was otherwise provided for in the written offering circulars.

A superseding indictment was returned on February 14, 2012. A seven day trial began on June 11, 2012. On June 20, 2012, a jury found Durham guilty on all counts. Beyond identifying the object of the conspiracy underlying Count One, the verdicts contained no specific findings. The trial judge remanded all three defendants into custody and ordered that a Pre-Sentence Report ("PSR") be prepared. On October 31, 2012, Durham filed detailed and specific objections to his PSR (Dkt 413) and on November 26, 2012, Durham filed a sentencing memorandum. (Dkt 429).

A sentencing hearing was conducted on November 30, 2012 and the trial judge summarily overruled all objections. The district court sentenced Durham to a total sentence of 50 years and special restitution in the amount of $208,830,082.77 which was equivalent to the forced bankruptcy recoveries at the time, minus the debts to investors of Fair. The trial judge determined that the "intended" fraud loss was $250 mln because that was the amount Fair sought in a reauthorization and that represented the amount the defendants intended to put "at risk." Alternatively, the trial judge determined that the "actual" fraud loss was $208 mln. The trial judge specifically noted that the defendants failed to present any evidence to rebut the presumption of actual loss established by the bankruptcy losses because the defendants presented no evidence of the fair values of the company borrowers prior

3

to the bankruptcy. Amended judgment was entered on December 14, 2012. All defendants filed a notice of appeal.

On appeal, Durham contended that the wiretap should have been suppressed for lack of necessity. Durham also contended that the district court erred in not accepting a jury instruction based upon whether certain fraud allegations were "in connection with a purchase or sale" of a security. Durham maintained the verdict should have been reversed because of the prosecutor's closing arguments and two wire fraud counts should be dismissed for lack of evidence. Durham also challenged the sufficiency of the evidence as to two wire fraud counts. Finally, the appeal challenged Durham's sentence length on, among other things, an incorrect determination of intended and actual fraud loss. The Seventh Circuit vacated two of Durham's wire fraud counts, II and V, for insufficient evidence and the case was remanded "for resentencing without those counts in the mix." *United States v. Durham*, 766 F.3d 672 (7th Cir. 2014). Durham filed for a *Writ of Certiorari* to the Supreme Court again raising all but the sentencing contentions, as the sentence was vacated. The Cert was denied on October 5, 2015. Before the Cert was denied, the trial judge set a resentencing for Durham. The trial judge concluded that the remand was "limited" rather than "general" and therefore ruled by the law of the case. The trial judge resentenced Durham to 50 years driven by the "actual loss" determination

4

and other enhancements found at the first sentencing. [1] Amended judgment was entered on July 7, 2015. Durham again filed for appeal. Durham contended that the remand unbundled the sentencing package and the remand was "general" and not "limited." Durham also contended that the new 50 year sentence violated this Fifth and Sixth Amendment rights and was therefore unconstitutional. The government contended that the remand issue was foreclosed by Seventh Circuit precedent and that Durham's lawyers had "waived" the "substantive reasonableness" challenge during his first sentencing. On February 3, 2016, the Seventh Circuit denied Durham's appeal apparently agreeing the remand was limited and also that Durham's counsel had waived his right to challenge the constitutionality and reasonableness of his sentence. *United States v. Durham*, 2016 U.S. App. Lexis 1780 (7th Cir. 2016) (unpublished). Durham again filed for a Writ of Cert to the Supreme Court contending that his sentence violated the Fifth and Sixth Amendments because the trial judge enhanced his sentencing guidelines based upon facts not found by the jury but found by a preponderance of the evidence by the trial judge taking his sentencing range determined by the jury verdict of probation to 6 months to a judge determined range of 255 years.

---

[1] In between the first and second sentencing, the United States Sentencing Commission issued a clarifying guideline amendment specifically explaining that the use of the amount put "at risk" to determine "intended loss" used in the Seventh Circuit was incorrect.

The second Writ was denied by the Supreme Court on October 11, 2016. This denial started Durham's time period of one year from the denial of Cert within which to file a 2255 motion to Vacate his Conviction or Correct his Sentence pursuant to 28 U.S.C. § 2255. This motion for a 2255 is therefore timely as it was filed within the one year time period allowed by statute.

II. Argument.

To determine if counsel has been ineffective, the Supreme Court set forth a two pronged test which requires a determination of (1) whether counsel's performance "fell below an objective standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 688 (1984), and (2) whether counsel's errors prejudiced the defendant, requiring the defendant to show a reasonable probability that, but for those errors, the result of the proceeding would have been different. *Id.* at 694. *See also Blackmon v. Williams*, 823 F.3d 1088, 1102-03 (7th Cir. 2016). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) quoting *Strickland*, 466 U.S. at 694."This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the likelihood of a different result must be 'substantial, not just conceivable.'" *Campbell v. Reardon*, 780 F.3d 752, 769 (7th Cir. 2015) citing *Harrington*, 562 U.S. at 111-12.

Furthermore, the Supreme Court distinguished between "strategic choices made after thorough investigation of law and facts relevant to plausible options," versus "strategic choices made after less than complete investigation." *Strickland*, 466 U.S. at 690-91. Strategic choices in the first category are "virtually unchallengeable," but those in the second are "reasonable precisely to the extent that reasonable professional judgments support the limitations on investigations. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* "In the second circumstance, the "decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment." *Id.* at 691. "We defer to strategic decisions of counsel made, even if that strategy ended unsuccessfully..." *Mosley v. Butler*, 762 F.3d 579,587 (7th Cir. 2014) citing *Shaw v. Wilson*, 721 F.3d 908, 914 (7th Cir. 2013). "[B]ut a strategic decision limited by poor investigation or preparation may be 'too-ill informed to be considered reasonable.'" *Id.* citing *United States v. Stitts*, 731 F.3d 887, 891 (7th Cir. 2013). *See also United States v. Best*, 426 F.3d 937, 946 (7th Cir. 2005) ("Few decisions not to present testimony can be considered 'strategic' before some investigation has taken place."). "Where a Strickland claim involves an allegedly inadequate investigation, the proper question 'is not whether counsel should have presented a mitigating case,' but rather ' whether the investigation

7

supporting council's decision not to introduce mitigating evidence of [petitioner's] background was itself reasonable.' " *Campbell v. Reardon*, 780 F.3d 752, 764 (7th Cir. 2015) citing *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003). As the Supreme Court stated, "Strickland does not establish that a cursory investigation automatically justifies a tactical decision with respect to ... strategy. Rather a reviewing court must consider the reasonableness of the investigation said to support that strategy." *Id.* at 527.

"Recently the Supreme Court stated '[c]riminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial, or both.' " *Thomas v. Clements*, 789 F.3d 760, 770 (7th Cir. 2015) citing *Harrington v. Richter*, 562 U.S. 86, 106 (2011). "Defendants [do not] enjoy an automatic entitlement to expert rebuttal witnesses whenever the government offers expert testimony in a trial," but there are times where the government's expert conclusion requires "expert illustration by the defense in order for the jury to weigh the evidence fairly." *Woolley v. Rednour*, 702 F.3d 411,424(7th Cir. 2012). *See also Rogers v. Israel*, 746 F.2d 1288, 1294 (7th Cir. 1984) (collecting cases and noting that "[i]n several cases, the failure to investigate and present expert testimony has been found to be a matter of trial tactics with-in the range of reasonable performance";"[y]et, under certain circumstances, 'it may be vital in affording effective representation to a defendant in

a criminal case for counsel to elicit expert testimony rebutting the states expert testimony").

Here, Tompkins ineffectiveness is very clear. As set forth above, Tompkins failed to do much of the most basic trial preparation. At the very onset, Tompkins agreed and understood that he would need to go through the discovery in electronic format on the hard drive and disks provided by the government. Literally, after the raids, the government was in possession of the vast majority of all of Fair's and Obsidian's original documentation. While Durham could find some of the relevant copies of certain documentation in his personal email account or documents that may have been on his personal computer, Durham had no originals of anything and had very little information prior to 2007. In late 2007, Durham was using an MSN email account and was running out of storage space. Durham therefore deleted the vast majority of all of his pre-2007 emails in late 2007 or early 2008. Because of this, Durham was unable to access the relevant email conversations between he and Birk, BGBC, Somerset, Goelzer, relevant staff and his lawyers during the periods most relevant to the government's case. Durham pointed this out to Tompkins who assured him that they would use the funds Durham provided to hire a computer consulting company, Novus, to write a program to enable Tompkins to search the discovery provided by the government. Tompkins claimed to Durham and reaffirmed to Egloff that Novus had provided an estimate that exceeded "6 figures" to provide a program.

However, Ray Bayley the Chairman and CEO of Novus, emailed Durham's sister and stated that he had never received the discovery and had provided no estimates. Email 9/03/17, Ex.1-139A.

Tompkins then told Durham he knew of a programmer at Indiana University that could do the programming for much cheaper. Durham's continued to ask Tomkins about the status of this new programmer many times and Tompkins continued to make excuses why he had not yet engaged them. Durham did have a copy of Fair's computer system backup that was seized by the government which contained some of the electronic versions of some files. However, the hard drive was not installed until sometime on or after 2005 and did not contain earlier information or, more importantly, original copies of contracts, notes, letters and other relevant evidence or any of the hundreds of documents that the government seized in their raid.

Tompkins never requested the hard drive or discovery or work product from Black's firm, the disks or any of the discovery or work product conducted by Bingham McHale on Obsidian's behalf,[2] Barnes and Thornburgh's work product and discovery for Durham, or anything from Carlile Patchen and Murphy, Fair's securities and bankruptcy counsel. To Durham's knowledge, while Tompkins did

---

[2] Durham actually contacted Black's firm in the summer of 2017 and received several boxes of documents and work product that Bingham had provided to Black's firm when they represented Durham. Further, at Durham's request, in August 2017, Black's office mailed an entire disk of everything related to Durham's defense they had in their possession. In 2015, Black's firm, on their own volition, had previously mailed the hard disk drive of discovery provided by the government to Durham's sister.

spend the weekend before trial going over the documents that the government finally provided as trial exhibits and witness lists, Tompkins never had any conversations of substance with any of these lawyers who had more than a year head start on the investigation.

Tompkins also told Durham that literally none of the managers or staff that had worked at Obsidian or Fair with Durham for many years would show up at trial or testify on Durham's behalf.[3] Also Tompkins claimed he had an extensive discussion with Whitesell and told Egloff he had spoken to "someone" at USRR. This too, was a lie. Tompkins did have a brief conversation with Whitesell on or about June 5, 2012, but failed to ask Whitesell the most basic questions about how the companies were actually performing and what their future appeared to be. According to Lagrone (other than the plant manager-the only executive at USRR), he never spoke to anyone related to Durham's defense, including Tompkins.

---

[3] . Tompkins continued to mislead Durham in a letter he sent him on October 16, 2014. Tompkins was handling Durham's disbarment proceeding. Tompkins recommended that Durham not voluntarily resign his law license. "The second reason I think it may be more advantageous top you not to resign is that eventually if we continue to proceed and you do not make admissions the Hearing Officer, Judge Eisgruber, understands that he will have to conduct a full evidentiary hearing where you can call witnesses and present evidence to him. *This would be an opportunity to subpoena anyone we want and have them come in and give testimony under oath. As you recall we had difficulty getting witnesses to show up at the trial because of what I believe was either overt or implied coercion and discouragement by the government.* This disciplinary forum would allow a full and complete public record that may very well result in evidence that could be used to support a habeas petition following any appellate rights being exhausted." *See* Letter Dated 10/16/14, Ex. 1-155. In an interview by Egloff, Tompkins now contends he did not need to call any witnesses because they could not testify about the DCF valuations prepared by Snow or the reserve and impairment determinations derived there from. *See* Egloff Notes.

Tompkins spoke to Kaffen a few times but deemed him an immaterial witness because he had nothing to do with the company valuations. Tompkins also did speak to Birk briefly about the collateral dispute in 2003 and 2004, but failed to ask him about the loans Durham had assumed, the Laikin loan, the Vacation royalties or the placement of other loan receivables and certain acquisition debts on Durham's line of credit with DCI.

Tompkins told Durham the financial expert, Stout Risius Ross ("SRR"), that Durham had paid an initial $25,000 retainer to before his indictment, was suddenly suffering from a conflict of interest because they allegedly were working with the government on some unspecified project. When asked why he did not continue with SRR, Tompkins answered he did not recall. But when asked by Egloff if it had to do with some unspecified conflict of interest, Tompkins responded "that sounds about right???" Durham contacted SRR through one of his attorneys who discovered Tompkins blatantly lied about this fact. SRR was never contacted by Tompkins, they had no conflict and were awaiting his call and were preparing to go to trial on Durham's behalf.

Tompkins claimed he did not know of any other investment bankers. Durham located Houlihan through Birk. However, it was apparent at that point that Houlihan did not have nearly enough time to appropriately prepare for trial. Durham asked Tompkins to seek an extension. However, Tompkins told Durham he feared

disclosing SRR name and the fact that they had a "imaginary" conflict. Later, after the government challenged Houlihan and Covert as expert witnesses, Tompkins was forced to reveal SRR. Tompkins then lied to this Court when he claimed SRR was not available because of traveling constraints and the distance from Detroit to Indianapolis. Thus, even though Tompkins clearly recognized all that Houlihan would need to know to adequately testify for Durham (*see* email to Ong, Ex. 1-137), Tompkins refused to ask for an extension to allow Houlihan the necessary time or the money to adequately get up to speed on all the issues that Durham needed to mount an effective defense.

Houlihan did provide a letter on June 5, 2012, outlining their expected testimony and that they believed that the DCF's calculated by Snow for the years 2006 through 2008 were reasonable and, with minor exceptions, correctly completed. However, even though the June 5 letter did say that Houlihan had obtained the DCFs completed in November 2009 and submitted to the ODS, Houlihan apparently did not have enough time to review those DCF valuations-the valuations actually being challenged by the government. Thus, Durham had no way to defend against the government's assertions the companies were either "grossly overvalued or completely worthless." Had Tompkins re-engaged SRR this would not have been an issue since they had already reviewed the 2009 DCFs and concluded they were reasonable and, again with minor errors that ran both ways, were correctly

completed. Additionally, the 2009 DCFs were calculated using the same Excel models from Goelzer and were in line with the valuations Goelzer had made four years prior even though the companies were actually performing much better than when Goelzer completed their initial appraisal.

Tompkins told Durham that Dan Laikin was unavailable to testify at the Franks hearing because the government had said that Lompoc did not have video conferencing available. Durham's sister contacted Lompoc a few years later and learned Lompoc did have video conferencing available since the mid-2000s and that this was apparently another lie. Tompkins also believed that Laikin could not testify because he could successfully invoke his Fifth Amendment rights-which was also not true. Finally, Tompkins told Durham that Laikin's attorney who attended his proffer session could not testify unless Laikin let them because of the attorney-client privilege. Again Tompkins was mistaken about the law on attorney-client privilege.

Furthermore, Tompkins knew of Durham's decades long involvement with the Republican Party. He also knew the potential for bias by Magnus-Stinson. When asked by Durham to file for a motion to recuse Magnus-Stinson, he refused because he believed she could deny the motion and did not understand that her ruling was immediately subject to review upon the filing of a *Writ* of Mandamus to the Seventh Circuit. Durham's second counsel for his resentencing, Ken Riggins failed to

investigate the facts surrounding the recusal and would not discuss it with Durham after he raise the issue.

Durham's appellate counsel, Kirkland and Ellis, also failed in three significant ways. First, they failed to challenge the faulty determination that there was probable cause to wiretap Durham's cell phone in favor of raising a frivolous challenge to the necessity of the wiretap-a claim that rarely succeeds in any Circuit and, to Durham's knowledge, has never succeeded in the Seventh Circuit. However, challenges to warrants based on a lack of probable cause are regularly overturned.

Kirkland also neglected to call the Panels attention to a very significant intervening Supreme Court decision in *Burrage v. United States*, 134 S. Ct. 881 (2014). The Court in *Burrage* interpreted the scope of the language "results from" and what "but-for" causation means in a situation where there were multiple potential causes. This decision dramatically narrowed the reach of but-for causation in this context. The Court held that but-for causation requires that the cause must be an "independently sufficient cause" of the harm. *Id.* In *Burrage*, the Court concluded that the victim would have lived but for his heroin use." *Id.* Likewise, here there is no evidence that Fair would not have gone into bankruptcy and suffered liquidation losses "but-for" the alleged frauds. In fact, given the additional substantial information required after the renewal submitted in November 2009 because of the negative publicity and

15

criticism of the IBJ, Fair would have likely failed and been driven into a forced bankruptcy.

In short, the Supreme Court demonstrated that even if the "fraud" was contributing or even substantial factor in the losses at Fair, the government did not present any evidence that proved, even by a preponderance of the evidence, that the alleged frauds (even if true) were the "independently sufficient" reason for the losses. This case was handed down while Durham's appeal was pending and would have therefore been applicable to Durham on appeal. However, Kirkland failed to bring this case to the Panel's attention.

Kirkland also failed to challenge the wire fraud counts that were based on phone calls and emails. To satisfy the statute, the government was required to prove beyond a reasonable doubt that the parties to the calls and emails were in different states at the time of the communications. The government here offered no such proof to meet their burden at trial. And Kirkland failed to raise this issue on appeal.

Additionally, Tompkins had an actual conflict of interest because his pecuniary interests were not aligned with Durham's defense. Durham had advanced to Tompkins $1,000,000 to cover the anticipated significant trial expenses and Tompkins fee. Durham and Tompkins discussed the trial strategy and that experts were definitely required and that Durham had already engaged a firm, SRR, that had

substantially begun the work. Further the two discussed many other trial needs and discussed the significant funds that would be required.

After Durham wired the funds to Tompkins, he knew that Durham was literally broke at that point and had agreed to transfer virtually all of his assets to the bankruptcy trustee in satisfaction of his personal guarantees to Fair. As expenses arose, Tompkins began covering them and had no agreement with Durham or anyone related to Durham to cover those expenses.

Tompkins now claims the entire $1,000,000 was meant to be his fee, even though he admitted to Egloff he knew Durham had no other resources. Tompkins claims that Durham agreed he would only spend a portion of his time on Durham's case and that he supposedly spent an average of twenty hours per week on Durham's case prior to trial. Durham even finds this claim incredulous as he witnessed Tompkins continued unavailability and attention to many other cases. Certainly Tompkins actual billings for that year and trial schedule would confirm Durham's observations.

Even if one is to believe Tompkins version, excluding holidays and his vacations, Durham allegedly agreed to a fee to Tompkins for his legal work nearing $1,200 an hour placing his billing rate in the top ten lawyers in the United States. Also, if Tompkins is to be believed, Durham spent his last dollar on Tompkins exorbitant fee and literally left himself with no remaining funds to pay for any of the required

experts and other expenses he certainly knew he required to mount a successful defense and for which he had already advanced an initial retainer of $25,000.

There is little doubt that Tompkins suffered from an actual conflict of interest that adversely affected his performance. *See Cuyler v. Sullivan*, 446 U.S. 335 (1980). By failing to continue with SRR or at least provide Houlihan with necessary funds to enable them to get up to speed and to make the many other basic trial preparations detailed in Durham's 2255, Tompkins faced a choice between spending the necessary advanced funds or advancing his own pecuniary interests by neglecting to do so. There is no doubt that Tompkins advanced his own interest over that of his clients. *See Hall v. United States*, 371 F.3d 969, 973 (7th Cir. 2004). There is also no doubt that the actions specified in Durham's 2255 are "plausible alternatives" to the strategy Tompkins actually pursued. *See Taylor v. Grounds*, 721 F.3d 809, 819 (7th Cir. 2013). Furthermore, a showing of prejudice is not required when ones' attorney labors under an actual conflict of interest. *Cuyle*r, 446 U.S. at 349.

On this basis alone, Durham's conviction and sentence should be vacated. However, even if there was no actual conflict, Tompkins performance here surely did not meet the standards required under *Strickland* and Durham's Sixth Amendment right to effective assistance. There is little doubt that had Tompkins performed as required, Durham would have been found not guilty on all counts, or, at the least, his sentence would have been decades shorter.

18

Before and at trial Tompkins failed to perform as required. He failed to subpoena the necessary Fair employees and managers, Whitesell, Lagrone, Bontrager, Kaffen, Birk and of course, the necessary experts. He also failed to present any documentary evidence or email work product that would have demonstrated that none of the defendants was engaged in any fraudulent conduct.

The government also played portion of phone calls to mislead the jury to believe the calls were evidence of nefarious intent. For example, when Cochran said that they could not fire Derose because he could "bust us," the jury would have understood that Cochran was fearful that Kaffen would learn from Derose that Durham and Cochran had begun and negligently allowed to continue a temporary receipt program that arguably ran afoul of the federal and state securities laws. Kaffen had expressly and vehemently told Durham and Cochran not to implement the program and if he did so he would resign in the middle of the renewal process. Unfortunately, this directive occurred after they had already begun the program and Durham was negligent in stopping it until Kaffen's partner discovered it was already implemented at a Fair branch office. Cochran's comment, placed in context, was obviously about this issue and not that the two were worried about Derose revealing any major fraud concerning the financials at Fair that they were allegedly perpetrating against the Fair investors.

Had Tompkins presented the necessary and available evidence, the jury would have also understood that when Durham told Cochran that certain impaired loans would be "vaporized" that Durham was actually explaining that certain loans were to be impaired and then immediately lawfully distributed to Durham and Cochran. This would have been unlike a prior time when Durham had assumed certain loans that remained properly on Fair's balance sheet as assets.

The largest of these loans was to Pyramid Coach and its associated leasing companies and all the relevant appraisals for the coaches had been lost in a flood. Thus, Fair had no documentation to support any kind of valuation or any required reserves regarding these loans. But when distributed out of Fair, they would be removed from 's balance sheet and its assets and net worth. In that case they literally were "vaporized." While it is an admittedly odd term to use, the jury would have understood that it described a completely legal transaction.

Had the jury been provided any evidence by Tompkins, the jury would have also understood that when Cochran said that if the ODS did not approve the renewal that Fair would "blow up" and that they would "blow up" the state of Ohio, he was expressing the very real potential that Fair could be forced into an involuntary bankruptcy if not renewed. Because Fair's collateral was dependent in a significant degree by the underlying values of the companies which were based upon the future performance and projections of those companies, if a lack of renewal triggered a

20

forced liquidation of Fair and its loan assets based upon the operating companies, Durham, Cochran, as well as the Fair investors would suffer great losses-which, in fact, is what actually happened.

In one conversation, Durham and Cochran discussed what might happen if the renewal was not approved:

Durham:  I mean from day one, Jim, if you went into a forced liquidation of the company, you'd be short.
Later Cochran said: But we're dealing with the fucking bureaucrats here and they think things should be totally there to shut down and pay everyone off one at a time. I don't know how anybody could ever do that. Tr. 16.

Clearly Durham and Cochran realized that a forced shut down of Fair would result in a loss of substantial "fair value" of Fair and its borrowers and would mean they would get "blown up" as well as the Ohio investors. Had Tompkins presented an explanation of the manner in which Fair made mezz type loans based upon the future going values of the companies, the jury would have understood that this call did not mean Durham and Cochran wanted to intentionally "blow up" Fair or the investors, but it was simply a fear and recognition that near devastation to Fair and its investors was a real possibility if Fair's authorization was not renewed.

The government introduced another call where Cochran questioned Durham whether there was anything for which they could "go to jail." The exchange went as follows:

21

Cochran: Is there-yeah uh, uh, if this doesn't go through we're going to be sued like hell. Is there a way we could go to jail here?

Durham: No, I mean do I?

Cochran: I mean for misuse of real estate loans, hu?

Durham: No, No.

Cochran: Okay

Durham: You can't go to jail for taking real estate loans ...

Cochran: Yeah, we spelled it out.

Again, had Tompkins presented any of the Fair managers at trial they could have testified that another Akron based company, Evergreen Financial, had been shut down by the ODS a few years prior and several of the principals had gone to jail for fraud involving residential mortgages. Having this context, the jury would have understood that Cochran's comment was a recognition that he mistakenly believed the Evergreen officials had gone to jail for making personal real estate loans, as Fair had also done for him. With this context, the jury would have known that Cochran's comment in no way reflected his belief that he and Durham were committing some major fraud against the investors at Fair regarding its financial condition. He was simply concerned that maybe making personal real estate loans, in and of themselves, were somehow illegal.

III. Conclusion.

Durham maintains that there was no scheme to defraud any investor as is abundantly clear from the evidence presented in his 2255 Motion. The government presented no employee or anyone "on the inside" who testified that they believed there was any scheme to defraud. Even government witness, Don Fair, who knew all aspects of Fair's operations both historically and had kept up his knowledge through various conversations with management and by actually reading the Circulars, said he did not believe there was any fraud. Doug Derose, another government witness and Controller at fair said he did not believe he had committed any fraud. The government's entire case was built on circumstantial evidence and innuendo from the partial presentation of the facts.

But more remarkably, Durham's various lawyers also failed to perform as required under the Constitution. The most obvious failure was by John Tompkins. Tompkins had been given "plenty of money" to advance the strongest defense to prove the government claims were unfounded. However, Tompkins presented only one witness, failed to cross-examined most witnesses and presented no documentary or work product evidence. He spoke to only a handful of witnesses and claimed his private investigator spoke to more. However, nearly all the witnesses contacted by Durham had never heard from Tompkins or anyone related to the defense. Further, Tompkins claimed none of the witnesses would testify because the government had terrified them from doing so. Here again, it is clear Tompkins lied. Tompkins even

23

continued to maintain this lie to Durham years after the trial. No witness said they would not testify. He also claimed witnesses were missing or "going on vacation." Another series of lies.

Tompkins also claimed that Novus Law had estimated that it would take "6 figures" to design a program to search the government provided discovery. This was also a lie. Tompkins never provided the discovery to Novus and they never provided any estimate. To Durham's knowledge Tompkins never even received the government discovery. Tompkins continued to lie when he told Durham he would locate another programmer.

Durham also asked Tompkins to move for Magnus-Stinson's recusal for her appearance of bias. Tompkins said she alone would make the decision and did not understand that this decision was immediately subject to review by mandamus to the Seventh Circuit. Durham's second attorney, Ken Riggins would not discuss the recusal either and ignored Durham's plea to remove Magnus-Stinson.

Pre-trial, Durham spoke to Tompkins about the need for Dan Laikin to appear at the *Franks* hearing. Durham knew from reading the Halliden Affidavit that something was amiss. Durham knew that Laikin, inspite of the fact that he was on Fair's Board of Directors, did not know anything about Fair and that Halliden's claims of Laikin's supposed confessions never could have happened unless either

24

Laikin lied to the FBI or the FBI was Durham also located a deposition where Laikin admitted he knew nothing about Fair. There were only two ways to prove this. Tompkins needed either Laikin or his attorneys who were witnesses to the proffer session or both. Tompkins lied to Durham when he said the facility where Laikin was housed had no video conferencing available. He also misunderstood the law and mistakenly believed Laikin could invoke his Fifth Amendment rights and that his attorneys could not testify because of the attorney client privilege. Both assumptions were wrong.

The FBI installed the Voice Box wiretap software on Durham's phone line several days before they had received a warrant from the Court. The FBI also voice tested this software prior to the warrant and indexed over 550 calls as well. Tompkins failed to hire a wiretap expert to opine as to whether the FBI could listen to the calls once they had installed the Voice Box software even though he had told Durham he had done so.

Durham had previously hired SRR who had over a year head start on their review of Fair's financials and DCF work product. They had already told Durham that they found no fraud in Fair's DCF calculations and understood that Fair's loans were substantially similar to mezz debt and that the underlying DCF "fair values" of the companies supported Fair's reserve and impairment decisions.

Durham asked Tompkins multiple times to contact SRR and reengage them to finish their analysis and prepare for trial. Finally, just weeks before trial Tompkins again lied to Durham and told him he had spoken to SRR and that they had developed an unexpected conflict of interest and could not testify on behalf of the defense. Tompkins then told this Court that SRR logistically was not available because apparently Detroit is just too far to for them to travel. Durham later discovered these were lies as well. Tompkins never contacted SRR. He fabricated the entire story. He then told Durham that the new experts, Houlihan, were not ready for trial and could not be called either.

At sentencing, Tompkins incompetence and lies continued. Tompkins sent a draft sentencing memorandum that cited more than a decade old and superseded guideline that defined "fraud loss." Durham's ex-wife and current husband advanced the funds to hire another attorney to write the brief and objections to the PSR. Tompkins failed to challenge the government's evidence that the bankruptcy recoveries equated to the actual value of Fair's collateral prior to the bankruptcy. Tompkins explained to Egloff that he just did not know how he could have gotten any expert to opine as to Fair's valuations. Tompkins failed to call any witnesses or allow Houlihan to complete their obviously incomplete initial review in spite of having "plenty of money" and additional months.

Durham believes that Tompkins lied extensively because he simply wanted to keep the entire $1,000,000 advance and basically "threw" the trial and sentencing. If Durham was in jail, it was much less likely Durham could sue him for malpractice

and retrieve any of the pre-paid funds. To continue the deception, Tompkins continued to lie to Durham well after the trial was over. Oddly, Tompkins claimed to Egloff that he had a discussion with the US Attorney's office prior to accepting the fee and they had agreed not to pursue recovery of it from him. Also, in an extremely strange move, the bankruptcy trustee, likewise, never pursued Tompkins for the fee, even though they had even sued one of Durham's step-children for a few thousand dollars he had given him more than a decade earlier and completely unrelated to Fair.

Unfortunately, Durham's appellate counsel also failed to challenge obvious appellate issues in favor of and against Durham's strong protest of other issues Durham told them he believed had absolutely no merit. Just days before the brief was filed, Durham raised the only winning issue on appeal. Durham finally received certain trial records from Kirkland and pointed out the obvious lack of evidence as to at least two wire fraud counts. At the last minute, Kirkland inserted that issue in the brief and they were the only two counts to be overturned on appeal. Furthermore, Kirkland failed to bring to the Panel's attention an intervening Supreme Court case that dramatically changed the "but-for" causation analysis at his sentencing.

These multiple deficiencies denied Durham his Constitutionally Guaranteed Right to the effective assistance of counsel. Had he had that assistance, Durham would not have been found guilty and would not have been sentenced to decades in jail for a crime that simply never happened.

Executed this 5th day of October 2017

Respectfully Submitted,

Timothy S. Durham
Reg. No. 60452-112
USP McCreary
PO Box 3000
Pine Knot, Kentucky 42635