FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

2017 OCT 23  PH 3:09

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

|  |  |  |
|---|---|---|
| Timothy S. Durham<br>*Petitioner,* | ) ) ) ) ) | |
| v. | ) ) | Crim 1:11-CR-00042-JMS<br>Civ. No. 1:17-CV-03590-JMS-DML |
| UNITED STATES OF AMERICA<br>*Respondent,* | ) ) ) ) ) ) | |

## Motion to Recuse The Honorable Jane Magnus-Stinson

### October 10, 2017

Comes now, Timothy S. Durham, *pro se*, and hereby seeks the recusal of the Honorable Jane Magnus-Stinson, District Court Judge of the Southern District of Indiana, with regard to any and all proceedings in connection with Durham's Motion §2255 to Vacate Durham's Conviction and Sentence, which has previously been filed with the district court. This Motion seeks recusal pursuant to 28 U.S.C.§ 455(a), for the appearance of prejudice and bias; pursuant to 28 U.S.C.§ 455(b)(1), for actual bias; and pursuant to the Due Process Clause of the Fifth Amendment of the United States Constitution for actual bias and the appearance of bias.

I. Facts.

Durham has filed, a §2255 motion to vacate his conviction and sentence. Ground 6, therein, contends that Durham failed to move for Magnus-Stinson's recusal. Those facts and discussions are incorporated herein.

The business and political life of Durham and Magnus-Stinson have intersected in very negative ways over the past several decades. Durham has been a lifelong staunch Republican since the early 1980's. Further, since 2002, Durham has had a tumultuous past with the officers and directors, (including Robert Wagner- who was the first employer, close personal friend, political sponsor and mentor of Magnus-Stinson) of locally based cell phone distributor, Brightpoint, Inc., and its major competitor, Cellstar, Inc.

1

For more than 30 years, Durham has been a consistent and instrumental political foe to Evan Bayh and his political allies, Joe Hogsett and Bart Peterson, efforts to regain and keep control of Indiana political offices for the Democrat Party. Durham was instrumental in ending the Bayh led regime beginning in the early 2000's with the election of Mitch Daniels as Governor of Indiana and Carl Brizzi as Marion County Prosecutor. Durham was one of, if not the largest, personal contributor to Daniels election efforts and was the Campaign Finance Chairman and the largest campaign contributor to Brizzi. Hogsett, Bayh's best friend and longtime political ally, became the Chairman of Indiana's Democrat Party at the same time.

In the Mid-2000s, Durham also became Chairman of the Greater Indianapolis Republican Finance Committee ("GIRFCO"), the fundraising organization for Indianapolis Republicans. In 2007, the Durham led GIRFCO and the Marion County Republican Party recaptured the Office of the Mayor of Indianapolis from Democrat Bart Peterson. Peterson was Bayh's former Chief of Staff when Bayh was Indiana's Governor in the 1990's. Magnus-Stinson was Peterson's Deputy Chief of Staff and Legal Counsel at the same time. In 2007, Durham's GIRFCO also reclaimed the control of the Indianapolis City-County Council.  Along with the successful recapture of the Governor's office, Durham led Brizzi's efforts to become elected Marion County Prosecutor in 2004 and re-elected in 2008. These successes virtually stomped Bayh's grand plan to have Democrats control all statewide and Indianapolis

offices. In 2008, Durham also became the Indiana Co-Chairman of Rudolph Guliani's Presidential bid, while Hogsett became Hillary Clinton's Indiana Chairman, and Bayh was her National Campaign Co-Chair.

In 2009, Durham was continuing the efforts to solidify the control of the Republican Party by making plans with Brizzi to run as either the next Mayor of Indianapolis or Governor of Indiana. Furthermore, as Daniels was soon to be term limited as Governor in 2012, Durham was actively strategizing with his ex-father-in-law Beurt SerVaas, not only as to his replacement, but also as to Daniels upcoming run against Barak Obama as the Republican nominee for President of the United States. At this time, Durham also became Chairman of Tim Motsinger's campaign to become the Marion County Sheriff, the sole major Marion County office still held by the Democratic Party after 2008.

The political efforts of Durham came to a screeching halt shortly after the FBI publicly raided Durham's controlled companies on November 24, 2009, proclaiming that one of Durham's financial interests, Fair Finance ("Fair"), located in Ohio, was a "ponzi" scheme. The local press seized upon the connection with Durham, and Brizzi was essentially forced to withdraw from the political arena. Motsinger suffered the same fate and withdrew from the Sheriff's race.

Following the raids, Durham's companies quickly collapsed into a forced liquidating bankruptcy in early 2010. Shortly thereafter, Indiana U.S. Senator, Evan Bayh, recommended to President Obama the appointment of Durham's political foe and Bayh's closest political ally and former Chairman of the Democrat Party, Joe Hogsett, as U.S. Attorney for Indiana. Bayh also recommended to President Obama that Bayh's former Legal Counsel and Deputy Chief of Staff, Jane Magnus-Stinson, be appointed as a District Court Judge for the Southern District of Indiana. Hogsett was approved by the Democrat controlled U.S. Senate on October 7, 2010 and Magnus-Stinson received her commission on June 9, 2010. Soon thereafter, Hogsett's U.S. Attorney's office indicted Durham, not for running a "ponzi" scheme, but for "misrepresenting the financial condition and manner in which they were using money" of Fair. Superseding Indictment, at Dkt. at 219. Defying the odds or perhaps at the request of the U.S. Attorney's office, Magnus-Stinson was selected as the District Court Judge to hear the case against Durham. Magnus-Stinson was also selected to hear the companion case against Durham filed by the United States Securities and Exchange Commission ("SEC"). Within a matter of weeks of Durham's indictment on March 16, 2011, Daniels suspended his effort to seek the Republican nomination for President.

In spite of having received strong encouragement and financial backing to run from former President George W. Bush and the Republican establishment. Halpern, Mark

and Heilemann, John, Double Down (2013) at 131-136. Further, after Durham's indictment, Hogsett's U.S. Attorney's office indicted several other close friends and political and business allies of Brizzi's, essentially insuring that Brizzi had no future political aspirations. After Brizzi left the Prosecutor's office, the Democrats captured the office.

Additionally, in 2002, Durham began aggressively acquiring the shares of locally based and publicly traded Brightpoint. Durham filed public statements of his intentions with the SEC that he was contemplating a hostile takeover and ouster of Brightpoint's Board of Directors and management, which included director Robert Wagner and President and CEO, Robert Laikin. Wagner, also a prominent Democrat in the Indiana Democrat Party, was Magnus-Stinson's extremely close personal friend, mentor, and first employer out of law school.

Following his hostile takeover effort of Brightpoint and his subsequent sale of those shares in 2006, Durham began acquiring the shares of Brightpoint's biggest competitor, Cellstar, Inc. According to Robert Kaiser, then Chairman of Cellstar, this action by Durham further infuriated Laikin and his directors, including Wagner.

Wagner and Robert Laikin have been close friends and business associates for decades and Wagner assisted Laikin when he initially formed Brightpoint in the early 1990's. They remain strong friends, business partners and allies.  Wagner now

is Laikin's personal attorney and business partner. The raid on Durham's companies was initially set in motion when Dan Laikin, Robert's brother, allegedly told the FBI that Durham was operating a "ponzi" scheme and operating a criminal enterprise at Fair. The FBI also interviewed Robert Laikin, who, told them they he had "heard" rumors that Durham was operating a Madoff type ponzi scheme as well. These indicia of probable cause allowed the FBI to raid Durham's businesses.

In addition to the facts cited herein, and in Durham's § 2255, Magnus-Stinson made negative comments about Durham and SerVaas just after trial and at sentencing. SerVaas posted Durham's million dollar bail by pledging a building he had owned since the 1960's which had then recently been appraised for over $3 million. Durham had loaned his ex-wife (SerVaas' daughter) nearly $1 million in part to remodel and repair her home. Magnus-Stinson's bias against Durham, but also her distain of the SerVaas family came to light. Magnus-Stinson demanded Durham be incarcerated pre-sentencing because she claimed that his bail money was somehow really provided to Durham by SerVaas because of Durham's loan to his daughter.

Magnus-Stinson also demonstrated her bias against Durham, his lifestyle, and his support for the Republican Party. The government charged Durham with misrepresenting the financial condition of Fair Finance and the use of its proceeds.

Durham, separate and apart from Fair, became extremely wealthy from many varied investments.

According to Magnus-Stinson's biography derived from her personal interviews, she has "a sense of frugality that she has incorporated into her personal life." *See* Ex. 6-1, of 2255 motion. And in explaining her motivation as a judge, she stated "What do you live for? Kids today are going to law school for public interest law, not for the big bucks. It is ok to live modestly, drive a used car. Then you can do the work that is so satisfying, help your fellow man." *Id.*

At Durham's sentencing, Magnus-Stinson commented extensively and derogatorily about Durham's affluent lifestyle. She derided Durham's purchase of a necklace for his fiancé in October 2009 as it was somehow illegal or improper, even though Durham purchased the necklace from his personal funds derived not from Fair, but his other independent resources. And there was literally no evidence that the purchase was in any manner fraudulent. Sent. Tr at 128. Magnus-Stinson expressed dismay that Durham felt "entitled to a lifestyle that involved two airplanes, several yachts, these cars that were allegedly owned by Fair investors..." *Id.* Again, however, Magnus-Stinson distorted the facts. Durham and Cochran did own two partial interests in a local plane company. There was never any allegation that these partial ownership interests were fraudulent.

Also, Durham purchased a yacht in 2003-2004 with his own funds, which was traded in on another yacht in 2004. There simply were not several yachts. Furthermore, Elizabeth McClure testified that when Durham sold his yacht in 2008, and the various companies needed cash, Durham deposited the proceeds from the sale into the companies.

Magnus-Stinson also distorted the record regarding the automobiles in Durham's auto sales company. Durham largely purchased the cars from proceeds from his other investments and assigned them to Fair as collateral when his accountants demanded tangible asset collateral to support certain business loans. These cars were not owned by Fair investors, but Fair had a security interest in them. Again, nothing in the government's case ever questioned that there was anything at all fraudulent about this security arrangement. In fact, it was another example of Durham using his otherwise acquired independent wealth for Fair's benefit.

Durham was an extremely large financial supporter of the Republican Party in Indiana and Indianapolis. Durham also gave to many charities throughout the years, as Magnus-Stinson learned through many of the letters Durham received in his support. Again, there was never any allegation or evidence that any political or charitable donation was illegal or improper in any manner. However, Magnus-Stinson disparaged Durham's actions afforded by his personal wealth. She stated "[i]t is very easy to donate to charity when you are donating someone else's money.

8

It is very easy to support your friends and family when you are using someone else's money, and that is what was happening here. " Sent Tr at 129.

To strike at Durham's political giving, a substantial part of which occurred before he owned Fair, and none of which was illegal or improper or related in any manner to the alleged frauds, Magnus-Stinson stated "[i]t is very easy to contribute to political campaigns and be a big player in the political scene when you are using somebody else's money..." *Id.* Again, there was no evidence at trial to support that Durham was "donating" anyone's money but his own. And there was no testimony at all about him being a "big player" politically – which Magnus-Stinson obviously knew independently of the trial record.

Magnus-Stinson struck at Durham's affluent lifestyle and her distain for it when she stated "This is the heartland. This is where we work hard. We work hard to put our kids through school, to get them paid off by the time that we retire so that we can maybe take some trips or buy a little place in Florida. We drive Chevy's and Buicks and Fords, not Bugattis ... it is utterly disrespectful of the law." Sent Tr 129-130. Durham did have a Bugatti sports car. But Fair's money was not used to buy the Bugatti--because the Bugatti was leased. Here, again Magnus-Stinson showed her disdain for Durham simply because he was wealthy.

Magnus-Stinson detested Durham for being one of the largest contributors to and leaders of the Republican machine who dismantled her "sponsors'" grand plan to take Indiana over for the Democrats, and for his public battles with her self-proclaimed "mentor".  These comments were not about any allegedly illegal or fraudulent activity. They were about Magnus-Stinson's personal bias against Durham.

Additionally, Magnus-Stinson's bias against Durham was manifested in connection with the companion SEC case. In 2013, Durham asked that the case be stayed pending the outcome of the criminal appeal which contested the validity of the convictions. Magnus-Stinson complied and administratively dissolved the case. However, she left an opening for the SEC to reinstate the case, without prejudice, if they brought a motion to reopen within 30 days of the conclusion of the appeal contesting the validity of the convictions. The appeal was handed down on September 3, 2014. The 30 day period came and went. Nearly 2 years later the SEC sought to reopen the civil action.

Magnus-Stinson allowed the SEC to reopen the case. Durham and Cochran objected and Magnus-Stinson ruled against them and allowed the suit to proceed.  In response to the SEC motion for summary judgement and disgorgement of profits of $208 mln of Durham's supposed illegal gains, Durham filed a response noting that there was no proof he had received anything at all illegally from Fair.   Once

10

confronted with the facts, Magnus-Stinson was forced to admit that there was no evidence Durham had received anything illegally from Fair.

Additionally, following closing arguments, the jury specifically noted the lack of evidence on Count 2, a wire fraud count involving an allegedly improper transfer of $250,000 from Fair to Durham. With counsel and defendants on a conference call, Magnus-Stinson explained the question from the jury and asked for input. Regarding Count 2 the jury asked: "Other than the bank wire, can you refer us to the exhibit documenting a $250,000 wire transfer for funds to remodel Durham's garage from 2/13/2007?" Tr at 1665. Magnus-Stinson responded: "[t]he Court does not believe that question can be answered" and asked counsel for their thoughts. *Id.* Magnus-Stinson told the jury that "The Court cannot answer your question. Please reread your instructions and continue deliberations." *Id.*, at 1666.

Of course, all parties, including Magnus-Stinson, at this point knew there was no evidence to support this wire fraud count. Defense counsel asked for a dismissal on all counts for insufficient evidence. Clearly knowing there was no evidence to sustain Count 2, Magnus-Stinson upheld the jury verdict against Durham as to that count anyway.

Finally, in connection with Durham's resentencing, Magnus-Stinson relied upon her close friend, Monica Foster, the Executive Director of the Indianapolis Federal

Public Defender's Office, to find an attorney for Durham. The attorney selected by Foster and immediately approved by Magnus-Stinson was Richard Mark Inman who was also the Chairman of the Board of the Indianapolis Federal Public Defender's Office and, it appears, a former law school classmate of both Magnus-Stinson and Foster. Durham quickly recognized an obvious conflict and questioned Inman why he would not automatically be disqualified. Previously the Federal Public Defender's Office represented Cochran and had voluntarily resigned from representing Cochran on appeal because of Dazey's closing comments at trial. Inman told Durham he agreed there was an actual conflict and said he would voluntarily resign. However, after waiting several weeks, Inman failed to resign and Durham filed his own motion for replacement counsel. Finally, Inman relented and filed his own motion to withdraw.

The very next day, Magnus-Stinson then appointed Inman's suitemate and partner, Eric Koselke, as Durham's new attorney. Koselke recognized the obvious conflict and told Magnus-Stinson that he would accept the appointment unless Durham objected. Koselke sent Durham a letter acknowledging the conflict and asked Durham if he should resign.  Durham told Koselke to resign because of the conflict. After Koselke failed to resign after several weeks, Durham again filed a motion for new counsel. Magnus-Stinson rejected Durham's motion because he was represented by counsel, even though a *pro se* motion to replace counsel is the only mechanism a

defendant has to seek new counsel. Koselke understood he was put in a terrible predicament by Foster and Magnus-Stinson and wanted out of the appointment. Even though both Durham and Koselke recognized the obvious conflict, Magnus-Stinson contended that she saw no conflict but finally allowed Koselke to resign.

Then a third lawyer was appointed by Magnus-Stinson at Foster's suggestion and he promptly resigned citing a conflict. Finally, Magnus-Stinson appointed Ken Riggins to represent Durham. Riggins refused to discuss the potential bias issue and recusal motion when Durham first mentioned it. Riggins told Durham he would not investigate nor file a recusal motion at Durham's resentencing

## II. Legal Discussion and Argument.

There are several grounds that support Magnus-Stinson's recusal from hearing Durham's § 2255 Motion. First, Durham contends that there is an appearance of bias that supports a recusal pursuant to 28 U.S.C. § 455(a) and under the Due Process Clause of the Fifth Amendment. Additionally, Magnus-Stinson should recuse herself as she is actually biased under 28 U.S.C. § 455(b)(1), and the Due Process Clause.

### A. Recusal under 28 U.S.C. § 455(a).

If there is an appearance of bias or prejudice to the reasonable, well informed disinterested observer, then "any...judge...shall disqualify himself in any proceeding in which his impartiality might be questioned." 28 U.S.C. § 455(a). Whereas § 144

and § 455(b)(1) are directed to case of actual bias, § 455(a) extends to those instances where there is an appearance of impartiality. *United States v. Johnson*, 680 F.3d 966, 979 (7th Cir.) cert. denied, 133 S.Ct. 672, 184 L.Ed. 2d 477 (2012). "§ 455(a) is generally understood to encompass the situations outlined in § 455(b), but also a broader range of situations in which impartiality exists, but its appearance is compromised." *United States v. Herrera-Valdez*, 2016 U.S. App. Lexis 11019 (7th Cir., June 17, 2016). "This requirement is not limited to particular issues within that proceeding. The statute aims to avoid the appearance of impartiality, which does not necessarily depend on the particular issues on which a decision turns." *Weddington v. Zatecky*, 721 F.3d 456, 463 (7th Cir. 2013). The Supreme Court has stated that § 455(a) requires recusal even though a judge may not actually have any knowledge of the facts supporting the bias claim. *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 861, 100 L.ED.2d 855, 108 S. CT. 2194 (1988). It is only necessary that a reasonable person, knowing all the circumstances, would expect that the judge would have actual knowledge of his or her interest or bias in the case. *Id.* §455(a) is not intended to protect litigants from actual bias in their judge but rather to promote public confidence in the impartiality of the judicial process. *See* H.R. Rep. No. 93-1453, 93rd Cong., 2d Sess. (1974), reprinted in 1974 U.S. Code Cong. & Ad. News 6351, 6354-55. "It is directed against the appearance of partiality, whether or not the judge is actually biased." *United States v. Balistrieri*, 779 F.2d 1191, 1204 (7th Cir.

14

1985). An "appearance of partiality may arise when in fact there is none. " *Litkey* at 567.

The Seventh Circuit has stated that under a recusal motion pursuant to § 455(a), "an objective standard is essential when the question is how things appear to the well-informed, thoughtful observer rather than to the hypersensitive or unduly suspicious person." *In the Matter of Mason*, 916 F.2d 384, 385 (7th Cir. 1990). The Court noted that "trivial risks" were not sufficient and that the search was for a "risk substantially out of the ordinary." *Id.* "Yet drawing all the inferences favorable to the honesty and care of the judge whose conduct has been questioned could collapse the appearance of impropriety standard under § 455(a) into a demand for proof of actual impropriety. So although the court tried to make an external reference to the reasonable person, it is essential to hold in mind that these outside observers are less inclined to credit judges' impartiality and mental discipline than the judiciary itself will be." *Id.*

The Seventh Circuit has required recusal "whenever there is a reasonable basis for finding an appearance of partiality under the facts and circumstances of the case." *In Re: United States*, 572 F.3d 301, 308 (7th Cir. 2009), and when "an objective observer might wonder whether [the judge] might not at some unconscious level favor [one party]." *Pepsico v. McMillen*, 764 F.2d 458, 461 (7th Cir. 1985).

In *Mason*, then District Court Judge John Tinder faced the decision whether to recuse himself for certain past political contributions of $100 each to two of the defendants in the case before him--namely the Mayor of Indianapolis, William Hudnut,III, and the Marion County Clerk, Faye Mowery, prior to becoming a district court judge in 1987. *Id*. The plaintiff's attorney, Stephen Laudig, made the motion to recuse pursuant to §455(a) as he was a candidate against Mowery in the then current election for County Clerk.

The Seventh Circuit noted that "(p)olitics plays a role in appointments to judicial office. Senators and other political figures who recommend candidates to the President, like the members of the Executive Branch who add their favorites, rarely select either strangers or political adversaries. Merit selection of federal judges means selection by merit from among a group that rises to the attention on other grounds-grounds not exclusively political, but often so." *Id*. citing Harold W. Chase, Federal Judges: The Appointing Process (1972); Neil D. McFeeley, Appointment of Judges: The Johnson Presidency (1987). "Courts that have considered whether pre-judicial activity is also prejudicial regularly conclude that it is not." *Id*. "A reasonable, well-informed observer takes into account this history when deciding whether a political connections call into question the judge's ability to render an impartial decision." *Id*. at 387. The Court then noted that Hudnut and Mowery were not said to be political "sponsors" of Tinder. "There are few other examples of

mayors influencing appointments to the federal bench, and no known examples of county clerks doing so. Plaintiffs do not contend that any knowledgeable observer would believe that Judge Tinder owes a political debt to Mayor Hudnut or Clerk Mowery, a debt he might be tempted to repay in this case. Judge Tinder aided their campaigns for office, and they not his." *Id.*

The Court noted that contributions "raise less doubt than sponsorship." *Id.* "If Judge Tinder were a close friend of Mayor Hudnut or Clerk Mowery, we would have a more difficult problem." *Id.* citing *Baker v. Detroit*, 458 F. Supp. 374 (E.D. Mich. 1978). "Bonds of friendship have not been alleged. Similarly, we might have a much more difficult case if...the attorney gave significant financial support to the judge's campaign committee while the judge was on the bench." *Id.* The court ultimately concluded that the issue was best resolved by the resignation of the attorney from the litigation and not the judge. *Id.*[1]

The political relationship between Magnus-Stinson and Durham sets forth the "case" that the Court noted would significantly change their analysis. Two of Durham's most ardent opponents in politics are extremely close to Magnus-Stinson. First, Robert Wagner gave Magnus-Stinson her first job as an associate lawyer out

---

[1] "Even" though Durham is only vaguely acquainted with Tinder and does not ever recall ever meeting him, Tinder voluntarily recused himself from hearing Durham's request for a rehearing *en banc* from Durham's criminal appeal.

of law school. Evan Bayh, at Robert Wagner's urging, brought Magnus-Stinson into the Governor's office as the Governor's Legal Counsel and later Deputy Chief of Staff under Bart Peterson. Bayh and Wagner were then instrumental in having Magnus-Stinson appointed as a Marion County Superior Court Judge. Later, United States Senator Bayh, recommended Magnus-Stinson be appointed a federal magistrate judge. Finally, as one of his last official acts, Bayh nominated Magnus-Stinson to President Obama to become a Federal District Court Judge for the Southern District of Indiana, just months before Durham's federal indictment by Hogsett's U.S. Attorney's office. Quite literally, Magnus-Stinson owes her entire professional and political career to two men--Evan Bayh and Robert Wagner. There is simply no doubt that Bayh and Wagner have been Magnus-Stinson's "sponsors." Certainly, the well-informed, knowledgeable, reasonable, disinterested observer, knowing Magnus-Stinson's extremely partisan background, and very close ties to the Bayh regime, and additionally knowing of Durham's long and persistent efforts contrary to Bayh and Wagner would think that Magnus-Stinson would be biased against Durham. Further, this observer could easily believe that Magnus-Stinson owed Bayh and Wagner a "political debt" and "might be tempted to repay" Bayh and Wagner in Durham's case.

In the early 1980's, Magnus-Stinson worked for Ed Lewis and Robert Wagner in their law firm "Lewis and Wagner". Ed Lewis, the lead partner in the firm and was

a democrat powerhouse in the state.  Lewis was also Bayh's political "godfather as well as the actual "godfather" to Bayh's own children. This was no casual relationship. This is the very same lawyer who was often the adversary of Durham's former father-in-law, close friend, business partner and political ally, Beurt SerVaas, beginning in the 1960s and running through the 1990s.

Also, just after her appointment to the federal bench, Magnus-Stinson reconfirmed that her ties to her former boss, Robert Wagner, were still very much intact and extremely close, when she referred to Wagner as her "mentor" and such a close personal friend that she often spent Thanksgiving dinners at his house. Wagner is a longtime major political operative and fundraiser for the Indiana and Indianapolis Democrat party. He is also an extremely strong supporter of Bayh, Hogsett and Peterson and the variety of candidates they promoted and supported.  Wagner is not just a casual or even just a close friend of Magnus-Stinson. Wagner is obviously one of Magnus-Stinson's major "sponsors." Any reasonable observer could expect that she might be tempted to repay a debt to Wagner by acting against Durham in this case.

The politically related appearances of bias also are bolstered by Hogsett and his personal attendance at several days of Durham's trial, Hogsett's pre- and post-trial press conferences on the steps of the Courthouse, his relentless pursuit of Brizzi, his award to Ong for his prosecution of Durham, Ong's nomination to be a Federal

Judge, and ultimately Hogsett's own self-promotion of his instrumental role in the prosecution of Durham to support his race for Mayor of Indianapolis. Hogsett has been Bayh's closest political ally for over 35 years and has strenuously supported Bayh. Bayh, as recently as 2014, has enthusiastically supported Hogsett. There is also no doubt that Magnus-Stinson has been an extremely close part of the Bayh political machine. Hogsett and Magnus-Stinson were nearly simultaneously nominated by Bayh to Obama for U.S. Attorney and District Court Judge in 2010. For literally decades, Durham has fought against the Bayh-Hogsett machine and in the 2000's, successfully thwarted their efforts.

Even if Hogsett formally recused himself from the prosecution of Durham because of his actual conflict of interest (he was a partner at Bingham McHale, one of Durham's lawyers), he certainly made it appear to the public that he was leading the charge. This would certainly create the appearance to the reasonable, fully informed, disinterested observer that Magnus-Stinson was biased against Durham and biased in favor of Hogsett's led U.S. Attorney's office. Furthermore, because Hogsett has re-entered the political realm with his most recent run for Mayor of Indianapolis in 2015 (and most assuredly future political races) a well-informed reasonable observer could easily believe Magnus-Stinson would continue to be biased against Durham to protect the Bayh-Hogsett legacy. Cleary, any finding that Durham was actually innocent would reflect terribly on Hogsett's self-proclaimed legacy. No reasonable

observer would believe that now that Hogsett was no longer U.S. Attorney that any feelings of bias and prejudice toward Durham by Magnus-Stinson would magically evaporate. Magnus-Stinson still owes her entire life to these men. She must still protect their "accomplishments" and protect their reputations and political legacies.

While Magnus-Stinson worked for Governor Bayh, she was Legal Counsel and the Deputy Chief of Staff and reported directly to Bart Peterson. As detailed herein, Peterson later ran for and became Mayor of Indianapolis until Durham's led GIRFCO unseated him in 2007. A reasonable observer would believe that Magnus-Stinson would be biased against Durham because of Durham's public defeat and humiliation of her former boss and close friend, Bart Peterson in the 2007 mayoral election.

But the appearance of bias does not stop just with regard to the political world. Magnus-Stinson also would appear to be biased against Durham for his hostile takeover efforts of the business of her "mentor," close friend, first employer and lifelong political "sponsor," Robert Wagner.

Wagner was one of the very first board members of Robert Laikins' Brightpoint. The Laikins' great animosity for Durham is well documented in the § 2255. Wagner remains Brightpoint's first and only Board Member *Emeritus*. He also is one of Robert Laikin's attorneys and now business partner in a new joint venture with Brightpoint. Durham pursued two hostile takeovers that were directly in conflict

with Laikin and Wagner. Any reasonable observer, armed with the true facts, would believe that Magnus-Stinson would be biased against Durham and want to repay her lifelong professional debt to Wagner and exact revenge for her longtime close friend and "mentor."

But there is another long time Bayh disciple that joined the bashing of Durham. In August 2010, Ed Delany, an Indiana State Representative and husband of former Bayh staff member and former Democrat Chairperson, Ann Delany, publicly called for all Republican candidates who had received political donations from Durham to give them to the Fair bankruptcy trustee. Delany decided that all of the donations Durham had made must have been illegal. Delany was such a Bayh team player that he stepped aside so that Bayh's favorite team member, Hogsett, could run for Mayor of Indianapolis. This public declaration by another Bayh politico further demonstrates that the entire Bayh entourage of devotees was extremely hostile toward Durham.

But, remarkably, the resentment of Durham does not end with just Magnus-Stinson's political family of Bayh, Hogsett, Peterson, Lewis, Wagner and Delany. It seems many of Magnus-Stinson's other close friends and allies have great and publicly expressed animosity for Durham as well. For example, Robert Hammerle, a local criminal lawyer and husband of former law school classmate of Magnus-Stinson, Monica Foster, became a self-appointed expert on the Durham trial and

joined in the public bashing. (Magnus-Stinson publicly proclaimed, along with Wagner, Hammerle and others, her endorsement and public support of Foster when she was named the head of the Federal Public Defender's Office). In several local press interviews, Hammerle expressed his utter disdain for Brizzi and his alliance with Durham and called for the forfeiture of all political contributions ever made by Durham. Moreover, Hammerle expressed his extreme confidence that all of Magnus-Stinson's rulings in Durham's case were, according to him, absolutely beyond reproach and would never be overturned on appeal, even though, two of Durham's counts were reversed. This was all the more remarkable because, to Durham's knowledge, Hammerle never attended the trial.

It seems that every associate of Magnus-Stinson's is not only prejudiced against Durham, but they are openly hostile toward him. In fact, if Magnus-Stinson is not biased or prejudiced against Durham, she is the only one in her circle who is not.

B. Recusal of Magnus-Stinson is required because she is actually biased.

Under 28 U.S.C. 455(b)(1) recusal is required when a judge harbors actual bias against a party versus just the appearance of bias required under 28 U.S.C. 455(a). Under 455(b)(1) recusal is required when the judge has a personal bias or prejudice concerning a party. The phrase "personal bias or prejudice" echoes the language of

28 U.S.C.§ 144. The Seventh Circuit has interpreted the two statutes essentially the same way, with a few exceptions. *Balistrieri*, 779 F.2d at 1202.

Opinions formed on the "basis of facts introduced or events occurring in the course of current proceedings" are not normally, standing alone, sufficient to support a bias claim unless these opinions formed during the proceedings "display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Litkey v. United States*, 510 U.S. 540, 555-56 (1994). Thus, "[t]he negative bias or prejudice from which the law of recusal protects a party must be grounded in some personal animus or malice that the judge harbors against him, of a kind that a fair-minded person could not entirely set aside when judging certain persons or causes." *Balistrieri*, 779 F.2d at 1201.

Here, it is clear that Magnus-Stinson is actually biased against Durham based upon the circumstances that existed long before and apart from the criminal proceedings. Magnus-Stinson's adverse and hostile opinions of Durham were clearly developed many years before his trial and not obtained during the normal course of the criminal proceedings. Durham was extremely instrumental in unseating the Bayh-Hogsett led control of the statewide and city offices for the Democrat party in the 2000's. Bayh and Hogsett have continued to recapture those lost offices with Durham and the base of the Indianapolis Republican Party gutted. Hogsett continued to rely on his prosecution of Durham even though he was undeniably required to recuse himself

from Durham's prosecution because of an actual conflict of interest. There is no doubt that Durham was an arch-enemy of the Democrat party built up by and controlled by Magnus-Stinson's "political sponsor" Bayh and his politically allies and her "mentor" Wagner. Furthermore, it is no secret in the Indianapolis business community that Durham attempted to unceremoniously oust Wagner and the other officers and directors of Brightpoint.

No reasonable person would believe that Magnus-Stinson does not harbor animosity and bias toward Durham for his decades of strenuous opposition toward these men and their lifelong objectives. Not only is there no doubt of an appearance of bias here, there is actual bias that requires recusal under 28 U.S.C. § 455(b).

Also, Magnus-Stinson comments clearly demonstrate her actual bias against Durham. The Seventh Circuit has found that comments made by a judge "during the course of trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Tezak*, 256 F.3d at 718, citing *Liteky*, 510 U.S. at 550-51. "A judge's expression of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges" are not sufficient to demonstrate bias or prejudice. *Id*. However, such comments "may [require recusal] if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of

25

favoritism or antagonism as to make fair judgment impossible." *Balistrieri,*779 F.2d

at 1201. In *Tezak*, the Seventh Circuit noted the record in that case offered no

evidence of personal revenge or malice. *Id*. Here, the record offers much evidence

to indicate the personal bias Magnus-Stinson has against Durham. Magnus-Stinson's

comments and rulings are not of a nature that reflect annoyance, impatience or even

anger. They represent that Magnus-Stinson has a deep-seated resentment of Durham,

his political affiliations, his business accomplishments and his wealthy lifestyle.

While Magnus-Stinson tried to contend that somehow all of Durham's wealthy

lifestyle was attributed to Fair, the record, as well as her own SEC disgorgement

ruling, clearly refutes such a notion. Durham made tens of millions of dollars that

independently supported his lifestyle and contributions.

Furthermore, her comments are not standing alone. Arguably, a judge's comments

of the nature made against Durham may not, devoid of any prior adverse connection,

merit recusal "standing alone." However, viewed in light of Magnus-Stinson's and

her personal and political co-horts' long and significant animosity against Durham,

her comments of at trial and sentencing take on new significance and truly reveal

her underlying bias against Durham. Her comments were not isolated comments she

"picked up" on during trial. They demonstrate a deep-seated animosity that she has

clearly harbored for as much as decades. For example, Magnus-Stinson disparaged

Durham for his various contributions. However, there is nothing in evidence to

support that any of his contributions-politically or charitably-were illegally made or from any improper source.

Both Hogsett and Bayh are continuing to seek political office. It is incumbent upon Magnus-Stinson to "protect" these men and their legacies. Durham's § 2255 motion contends there was never any fraud, the raids upon his companies were not based on probable cause, and that his attorneys completely failed and were ineffective in defending Durham. A ruling vacating Durham's conviction would be devastating to Bayh's and Hogsett's future political career, in that Hogsett would be found to have apparently prosecuted innocent men and his hallmark achievement would have been illusory.

Magnus-Stinson's rulings on the reinstatement of the SEC litigation nearly 2 years after the SEC was foreclosed, with prejudice, from reopening the case according to her own order, and her attempts to force Durham to accept conflicted legal counsel, are rulings that clearly demonstrate her bias against Durham.

Even more egregiously, Magnus-Stinson upheld the jury's verdict on Count 2 even after the jury pointed out that there was no evidence to support a guilty verdict on that count. In the Seventh Circuit it is extremely difficult for any defendant to win a reversal of a conviction for insufficient evidence. In fact, [t]he defendant faces a nearly insurmountable hurdle." *United States v. Blassingame*, 197 F.3d 271, 284 (7th

Cir. 1999)."In considering such a challenge, we view the evidence in the light most favorable to the Government, defer to the credibility determinations of the jury, and overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find beyond a reasonable doubt." *United States v. Carter*, 695 F.3d 690, 698 (7th Cir. 2012). But Durham was successful in defeating that "insurmountable hurdle" and obtained a reversal of Counts 2 and 5 for insufficient evidence, the lack thereof which was already abundantly clear to Magnus-Stinson.

Magnus-Stinson's post-trial comments demonstrate her underlying previously held personal contempt for Durham and display a "deep-seated antagonism" and are not "standing alone." Magnus-Stinson's inflammatory comments were accompanied by extrajudicial decades long political and personal relationships adverse to Durham. Additionally, many of Magnus-Stinson's comments are not related to evidence presented at trial. Her comments certainly evidence bias against Durham that Magnus-Stinson acquired outside the scope of the trial or sentencing and are strong evidence of bias that Magnus-Stinson has had against Durham for many years.

C. Recusal of Magnus-Stinson is also required under the Due Process Clause of the Fifth Amendment.

While many questions of recusal regarding federal judges are addressed under ethical rules and federal statute, the appearance of bias can be so great that it also

violates Due Process. Recently the Supreme Court decided two cases where recusal was required under the Due Process Clause of the Constitution. *See Williams v. Pennsylvania*, 136 S.Ct. 1899 (2016), and *Rippo v. Baker*, No 16-6316, (March 6, 2017). "It is important to note that due process 'demarks only the outer boundaries of judicial disqualifications.' " *Williams* at 1908, citing *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 828 (1986). In *Williams*, the defendant, on a collateral attack motion, challenged a judge who was sitting in review of his case when that judge had also served as the prosecutor of the defendant 25 years earlier. *Id.*

"Due process guarantees 'an absence of actual bias' on the part of the judge." *Id.* at 1905, citing In re *Murchison*, 349 U.S. 133, 136 (1955). The Court noted that because "bias is easy to attribute to others and difficult to discern in oneself," an objective standard is required on review. *Id.* This standard "avoids having to determine whether actual bias is present. The Court asks not whether a judge harbors an actual, subjective bias, but whether, as an objective matter ' the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.' " *Id.*, citing *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881 (2009). In *Caperton*, the Court framed the inquiry as "whether under a realistic appraisal of psychological tendencies and human weakness, the interest poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." *Caperton*, 556 U.S. at 883-84. "Both

the appearance and reality of impartial justice are necessary to the public legitimacy of judicial pronouncements and thus to the rule of law itself." *Williams*, 136 S. Ct. at 1909. The Seventh Circuit recognized that "Due Process requires both fairness and the appearance of fairness in the tribunal." *Siefert v. Alexander,* 608 F.3d 974, 985 (7th Cir. 2010). Justice Thomas noted in his dissent in *Williams*, that prior to *Caperton*, "[p]erceived bias (without more) was not recognized as a constitutionally compelled ground for disqualification..." *Williams*, 136 S. Ct. at 1921.

"Due process entitles [the defendant] to 'a proceeding in which he may present his case with assurance' that no member of the court is 'predisposed to find against him.' " *Williams*, 136 S.Ct. at 1910, citing *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980). There is little doubt that the "average judge" in the same position is not likely to be "neutral" in matters involving Durham. Therefore, Magnus-Stinson failure to recuse herself would be (and has been) a violation of Due Process.

IV. Timeliness.

A. Under 28 U.S.C.§ 455(a) and (b).

There is no time limit under § 445(a) or (b)(1) to bring a recusal motion. The Seventh Circuit has expressly recognized the right to bring a recusal motion under § 455(a) even after the trial has concluded, as long as there are proceedings pending before that judge. *United States v. Diekemper*, 604 F. 3d 356, 364 (7th Cir. 2000);

*see also Weddington*, 721 F.3d at 463 (the case had to be remanded for further proceedings and the "appearance" of bias could be corrected before continuing). Other Circuits have likewise recognized this rule. "Although the issue could have been presented sooner, the motion was presented to the district court prior to a proceeding over which the judge would preside." *United States v. Furst*, 866 F.2d 558 (3rd. Cir. 1989) (distinguishing *United States v. Murphy*, 768 F.2d 1518, 1519 (7th Cir.) cert. denied 475 U.S. 1012 (1986), (where there were no further proceedings from which the judge could be recused).

Additionally, this recusal is brought in connection with a new civil proceeding pursuant to § 2255. The judiciary has long maintained that this proceeding is a separate and distinct from the initial criminal trial and sentencing. *See Pennsylvania v. Finley*, 481 U.S. 551 (1987). A post conviction proceeding "is not part of the criminal proceeding itself" but "is in fact considered to be civil in nature." *Id*. at 556-557. For example, because this is not a part of the criminal trial and sentencing, a petitioner under §2255 is not afforded any right to legal representation. *Id*. Therefore, because this §2255 is a new proceeding, this recusal motion is timely.

Most recently, the Seventh Circuit addressed whether Magnus-Stinson should have recused herself in a matter where she had previously sat on a case while a state court judge. The Seventh Circuit reversed earlier precedent and held that a recusal brought under §455(a) could be brought on appeal rather than only pursuant to a writ

31

of mandamus during the proceedings. *Fowler v. Butts*, 2016 U.S. App. Lexis 13267 (7th Cir. July 20, 2016). Previously the Seventh Circuit was of the "belief that problems with the appearance of partiality should be resolved as early in the case as possible..." *Id*. at page 3. The Court recognized that "[t]he judge, not the litigant, must take the initiative." *Id*. at 5. "[T]he judge must disqualify herself when the statute so provides whether or not the litigant files a motion." *Id*. Further the Seventh Circuit noted that "the participation of a disqualified judge as a form of structural error, which may be noticed at any time."*Id*. This case confirms there is no specific time limit with which to bring a recusal motion under § 455.

B. Under the Due Process Clause.

There is no time limit for filing a recusal motion pursuant to the Due Process clause. The Supreme Court has recognized a Due Process violation even in a collateral attack when no protest was made in the court where the challenged judge sat. *See Nguyen v. United States*, 539 U.S. 69 (2003) and *Williams v. Pennsylvania*, 136 S.Ct. 1899 (2016).

V. Conclusion.

Politics has always been a contentious and adversarial endeavor. Both Republicans and Democrats fight hard for their causes. People on both sides believe in their respective causes, often times very fervently and passionately. The battles in Indiana

politics over the last several decades have been just as adversarial and bitter as anywhere in the Country. Both sides have fought the other, sometimes with legal means and sometimes illegally. And normally, the mere affiliation or membership of a judge with one party or another is normal and often necessary, especially to obtain an appointment as a federal judge.

But this is not the usual or normal case. Here, Magnus-Stinson was not merely affiliated with nor some incidental supporter of the Democrat Party in Indiana. For all her professional life, Magnus-Stinson has been an instrumental player of the Bayh regime that has worked literally for decades to gain control of all significant political offices in Indiana for the Democrat Party, and she owes her entire professional career to Bayh and his team.

Also, Durham was not just a member or affiliate of the Republican Party in Indiana. He was the Chairman of many Republican campaigns and led many campaigns in direct opposition to the Bayh team for Durham's entire adult life. Durham was a primary force in the Republican Party as even Magnus-Stinson recognized at sentencing. His efforts enabled the Republicans to wrest control of Indianapolis and Indiana back from Bayh and his progeny in the 2000's. Durham was no bit player or incidental contributor.

Hogsett outwardly proclaimed Durham's prosecution and conviction as his personal victory, whether he had internally recused himself or not. That is the way the local press portrayed the prosecution and that is the way Hogsett himself promoted it in his bid to become Mayor of Indianapolis.

Durham continues to maintain that he is innocent and that there was never any scheme to defraud. While the primary substance of Durham's § 2255 Motion is based upon the ineffective assistance of counsel he received, any decision to vacate his conviction and sentence would have an extremely negative effect on Bayh and Hogsett. They need this conviction and unprecedentedly long sentence to be upheld as just and right by Magnus-Stinson to protect their own legacies.

Moreover, Magnus-Stinson could be said to "owe" Bayh for his years of unwavering support and promotion of her career. She also could be expected to have a great degree of personal animosity against Durham for his attempts to hostilely throw her first employer, close friend and "mentor," Robert Wagner, out of the company he helped found. And there is little doubt that Magnus-Stinson would be biased against Durham for his longstanding opposition to virtually everything her fellow Bayh colleague, Joe Hogsett, has ever attempted. Likewise, Magnus-Stinson would definitely harbor bias against Durham for his efforts in removing her former boss and Bayh co-hort, Bart Peterson, from the Mayor's office.

There is no doubt that a dispassionate reasonable person armed with all the true facts of Durham's significant involvement in the Republican Party and his long and strenuous efforts against the Bayh regime and Wagner and also knowing that every step of Magnus-Stinson's professional life has been made available because of her devotion and loyalty to and membership in the Bayh team, would obviously conclude that there was an unmistakable appearance of bias.

However, Durham maintains that Magnus-Stinson's bias pervades much deeper than any mere appearance. Durham believes that she is in fact actually biased against him. Her unsupported comments at trial and sentencing, her ruling in the SEC companion case and her rulings to try and force Durham to accept an admittedly conflicted attorneys at resentencing, would lead any rational observer to believe that Magnus-Stinson is and has been actually biased against Durham.

Magnus-Stinson should recuse herself and step aside here.


Respectfully Submitted,

Timothy S. Durham

Affidavit.

I, Timothy S. Durham, declare under penalty of perjury under the laws of the United States of America that the facts cited in this Motion to Recuse are true and correct.


Executed this 10th day of October 2017.


Timothy S. Durham
Reg. # 60452-112
USP McCreary
US Penitentiary
PO Box 3000
Pine Knot, KY 42635