UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF INDIANA

INDIANAPOLIS DIVISION

TIMOTHY S. DURHAM,                    )
                                      )
                    Petitioner        )
                                      )
        vs.                           )       CAUSE NO. 1:17cv03590RLM-DML
                                      )
UNITED STATES OF AMERICA,             )
                                      )       Arising from:1:11cr00042(1)
                    Defendant         )
                                      )

MEMORANDUM AND ORDER

Timothy Durham is serving a 50-year sentence for conspiracy, wire
fraud, and securities fraud. A jury found him guilty after an eight-day trial in
2012; the court of appeals reversed the convictions of two counts and affirmed
on the other counts and issues, but things wound up essentially where they
started after the resentencing. Mr. Durham filed this petition for relief under 28
U.S.C. § 2255 in 2017. The court resolved most of Mr. Durham's claims
without a hearing in 2019 but scheduled an evidentiary hearing to address two
of his claims. Following delays arising from the COVID-19 pandemic, the
complexity of the underlying case, and Mr. Durham's difficulty in getting and
keeping counsel, the court heard evidence over four days in May and June
2022. Much of the evidentiary hearing was devoted to Mr. Durham's testimony.
Written final arguments were filed on September 1, 2022.

Mr. Durham hasn't shown that his counsel's performance was constitutionally deficient under either of the theories he argues, so the court denies his petition for habeas corpus relief under 28 U.S.C. § 2255.

I.   FACTS AND THE CRIMES OF CONVICTION

Timothy Durham bought Fair Finance, Inc., through a newly created holding company called Fair Holdings, Inc., with James Cochran in 2001. Mr. Durham already owned a private equity fund named Obsidian Enterprises. The court of appeals summarized Fair Finance's pre-acquisition business:

> Before the events in this case transpired, Fair Finance was a respectable company and had been in the business of providing financial services since the Great Depression. By the early 2000s, the company primarily focused on purchasing consumer receivables. Fair would purchase installment contracts from businesses with a single, up-front payment at a discounted rate. This arrangement provided working capital for the business and a profit for Fair—the difference between what it paid for the contract and what it ultimately collected on it.

> Fair raised money to purchase these receivables by selling what it called "investment certificates"—a form of subordinate debenture that essentially functioned as a certificate of deposit without FDIC insurance. Certificate holders were paid interest at regular intervals. When a certificate came due, Fair sent a check to the holder for the interest earned before maturity. At that point the holder could redeem the original face value of the certificate or renew it, which involved redeeming an old certificate and purchasing a new one. If a holder took no action at expiration, the certificate would continue earning interest at a set rate. Before 2002 most certificates were offered for a six-month term and were no larger than $50,000 in value. The latter limitation was meant to ensure that the company could redeem the certificates without encountering liquidity problems.

> Certificates were sold exclusively to consumers in Ohio, and authorization by the Ohio Department of Securities was required. With each request for authorization, Fair needed to submit an offering circular disclosing its financial status and the investment's risks. The circular would then be distributed to potential investors once the new issuance received regulatory approval. According to data gathered by Fair, a majority of its investors were elderly and many lived on modest incomes. By all accounts, Fair was a trusted Ohio financial institution.

United States v. Durham, 766 F.3d 672, 676 (7th Cir. 2014).

Mr. Durham and Mr. Cochran loosened Fair Finance's operating rules, expanding both its capital and its liabilities. Customers could purchase certificates with longer terms, higher amounts, and higher interest rates. Fair Finance's outstanding certificate liabilities eventually doubled. The increased capital funded loans to Mr. Durham and Mr. Cochran, their friends and relatives, and related companies like Obsidian Enterprises, which Mr. Durham owned before acquiring Fair Finance. These "loans" had few of the ordinary hallmarks of commercial loans, and repayments were rare. Fair Finance began to change accountants as they began to question financial statements and the sufficiency of collateral for third party loans to "related parties," meaning entities with financial ties to Fair Finance. The financial crisis of 2008 helped expose the principals' activities when companies owned by Obsidian began losing money,[1] impairing Obsidian's ability to provide operating money to Fair Finance, which in turn lost its ability to make timely payments to the certificate

---

[1] The Obsidian companies in the relevant time were United Expressline, Inc., U.S. Rubber Reclaiming, Inc., Classic Manufacturing, Inc., and Parma CCG, Inc.

3

holders. Fair Finance principals told its employees to lull investors with mostly untrue explanations for delayed payments of interest and principal on certificates.

The FBI started investigating and ultimately got wiretap authorization to monitor phone calls. Many of those phone calls included inculpatory statements, and a few involved physical threats. The FBI executed a search warrant on Fair Finance's offices on November 24, 2009 and seized the computers, bringing Fair Finance's business to a sudden stop. "Fair's operations ceased, and it soon went into bankruptcy. More than 5,000 investors filed claims totaling approximately $215 million. The trustee recovered only $5.6 million in assets." United States v. Durham, 766 F.3d at 678.

Mr. Durham, Mr. Cochran, and Rick Snow were indicted and went to trial. Mr. Durham reports that his attorney pursued a *mens rea* defense, opting against avenues that were more likely to succeed. Mr. Durham was convicted of one count of conspiracy to commit wire fraud and securities fraud, 18 U.S.C. § 371, ten counts of wire fraud, 18 U.S.C. § 1343, and one count of securities fraud, 15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b–5. The court of appeals reversed the convictions on two of the wire fraud counts. United States v. Durham, 766 F.3d 672. Judge Jane Magnus-Stinson sentenced Mr. Durham to 50 years' imprisonment following trial and again following remand.

Indianapolis attorney John L. Tompkins represented Mr. Durham at the 2012 criminal trial. Mr. Tompkins testified at the § 2255 hearing that 95 percent of his practice in 2012 was criminal. A quarter to a third of his practice consisted of traffic and drunk driving cases. Mr. Tompkins worked in the county prosecutor's office's major felony division before going into private practice. He had tried 25 to 50 cases to juries, including state Class A Felony cases while with the prosecutor's office; fewer than five of his trials had been in federal court. Mr. Durham and Mr. Tompkins had known each other for several years. Mr. Tompkins told Mr. Durham of his interest in taking on the defense. He told Mr. Durham he had a good professional relationship with the federal prosecutor handling the case. As Mr. Durham tells the story, Mr. Tompkins can be said to have lobbied pretty hard for the job.

Mr. Durham testified at the § 2255 hearing that he first hired Indianapolis attorney Larry Mackey to represent him in the criminal case and that for reasons not in this record, Mr. Mackey told Mr. Durham to go with a different law firm. Mr. Durham then retained Miami attorney Roy Black, but couldn't pay him because Mr. Black didn't want to take money directly from Mr. Durham. Mr. Durham then called Mr. Tompkins and retained him in May 2011. Mr. Durham and Mr. Tompkins dispute the terms of their agreement.

## II.    THE TIME LIMIT

An issue arose during the § 2255 hearing that must be discussed, and it fits into this opinion nowhere better than here. When granting what became Mr. Durham's final motion to continue the evidentiary hearing, the court chose the last possible date. The government's attorney, Jason Covert, was scheduled to leave his job with the United States Department of Justice at the close of business on Friday, June 3, 2022. Backing up four days to reflect the time Mr. Durham's counsel believed the hearing would take, the court scheduled the hearing to begin on Tuesday, May 31, the day after the Memorial Day holiday. The hearing began on time each day.

At the end of the hearing's second day, when only three of Mr. Durham's anticipated 25 witnesses had testified and with only two days remaining in the government's attorney's Department of Justice career, the court met with counsel in chambers to discuss how the hearing could be completed in its allotted four days. It became apparent that without significant streamlining, an adjournment of several months would be needed for a successor AUSA to master the material in this case. The hearing's first two days had led the court to believe that significant streamlining was very possible. Rather than try to dictate the method of streamlining itself, the court set 3:00 p.m. on the hearing's fourth day as the deadline for completion of the petitioner's evidence, leaving time for the government's single anticipated witness to testify.

Mr. Durham objected to that time limit the next day, and the court overruled his objection. The hearing originally had been scheduled for two days; at Mr. Durham's request, the setting had been enlarged to four days even as the court expressed the belief that it shouldn't take more than three. The government's cross examinations had been proportional to the directs, briskly conducted, and to the point. The court days had been full. The court intends no criticism of Mr. Durham's counsel, who appeared to be trying to accede to the client's wishes while serving *pro bono*, but if anyone bore responsibility for inaccuracy in the time needed, it had to be the petitioner.

The judge conducting the hearing has no assigned courtroom in the Birch Bayh Courthouse, so any adjournment would entail finding a courtroom that would be available for a somewhat indefinite time. An adjournment would require a new attorney for the government to get up to speed in a document-intensive case (Petitioner's Exhibit 199 was admitted during the hearing's third day). All of this would, of course, divert taxpayer resources — no judge, prosecutor, court reporter, courtroom deputy clerk, law clerk, or U.S. Marshals sat idle lest Mr. Durham need a fifth or sixth day to go with the four he most recently asked for. The evidentiary hearing already had been continued eight times from it originally scheduled December 17, 2019; seven of those continuances had been on Mr. Durham's motion.

Given all these circumstances, the court overruled Mr. Durham's objection. Mr. Durham finished his evidence before 3:00 p.m. on June 3.

III.   THE ISSUES AT THE EVIDENTIARY HEARING

Mr. Durham's § 2255 petition raised several issues. The court's October 2019 opinion and order (Doc. No. 31) pared them down considerably but left two to be tried at the evidentiary hearing.

First, the October 2019 ruling reserved for hearing Mr. Durham's claim that his fee agreement with his trial counsel, John Tompkins, created an actual conflict of interest for Mr. Tompkins. Mr. Durham contends that he gave Mr. Tompkins $1 million, from which Mr. Tompkins was to pay the costs of the defense and keep whatever was left over. In Mr. Durham's view, that arrangement made Mr. Tompkins choose between his own interest and Mr. Durham's interest: the less Mr. Tompkins spent on the case, the more there would be for Mr. Tompkins's wallet. As Mr. Durham sees it, Mr. Tompkins didn't use the money to hire experts to testify at trial, underscoring how the conflict of interest harmed Mr. Durham.

Second, Mr. Durham came forth with enough evidence to justify a hearing on his contention that Mr. Tompkins provided ineffective assistance of counsel when he didn't call several witnesses – Terry Whitesell, Don Lagrone, Todd Bontrager, Ron Kaffen, Keith Schaffter, Rusty Riggenbach, Keith Kuczma, Stephany Brogan, Jeff Birk, Erin Beesley, Keith Schaffter, Rusty Riggenbach, and Jim Covert – to testify at trial, and failed to adequately cross examine witnesses Ben Kimmerling and Anthony Schlichte.

*A. Mr. Durham's Credibility*

Resolution of the issues requires the court to evaluate the weight to be given to the testimony of certain witnesses. As in any case, the court must base those credibility determinations on the court's observations of the witnesses as they testified and the testimony's overall reasonableness. Those determinations can only be made on what the court saw and heard when the hearing was conducted during week of Memorial Day 2022.

Mr. Durham was a witness of minimal credibility. That finding springs from the substance of some, and the manner of most, of his testimony. The bulk of Mr. Durham's testimony on direct examination was devoted to explaining evidence that made him look guilty at trial. Such explanations are commonplace in fraud cases, but they consumed much of the hearing's first day because there was so much trial evidence for Mr. Durham to explain. Many explanations were convoluted; several required sub-explanations to make sense at any level. Mr. Durham's credibility suffered as he piled explanations atop explanations, all the while contending that his trial counsel should have called witnesses to put forth each of the explanations.

Mr. Durham's modest credibility collapsed early in his cross examination. While Mr. Durham's memory for dates and details on direct examination was so impressive as to draw comment from his own attorney, it would have received barely a passing grade during cross. His answers became disjointed, with concessions occasionally sprinkled among denials so as to

9

make answers like a slalom event, turning first one way and then another and back again on the way to the answer's end. For example, when asked whether an offering circular disclosed that Mr. Durham was taking personal loans that he used to benefit friends, Mr. Durham said that (1) Fair Finance wasn't funding his personal expenses, (2) but the disclosure said he was, (3) although he wanted one of the contributors to the circular to be more clear so he added "which has resulted in higher personal loan balances," and (4) the circular also said proceeds of the loans funded "certain related and nonrelated entities that might not have enough collateral to maintain the loan," (5) which Mr. Durham thought should have been written a bit more clearly, (6) but also thought disclosed the personal loan situation because nothing could produce a higher loan balance unless there was a personal loan balance. (Doc. No. 7, at 221-222).

At another point in the cross examination, one of Mr. Durham's explanations of a falsehood in paperwork exceeded the court's ability to grasp:

> A      The point of the truth is, I didn't have any personal loan balance. Actually, I had paid the loan down. Once you add back in the Lampoon receivable that Osler left out, I was owed 35 million and had paid it down to 25. So I had paid in ten. Any personal loan balance I had was –
>
> THE COURT:      I don't think I understood at all what you said. You said you were owed 35 and paid back ten so you had paid it down to 25? This is you, Mr. Durham.
>
> THE WITNESS:    Yes, personally.
>
> THE COURT:      Owed to you at 35.
>
> THE WITNESS:    Yes.

THE COURT:      How you paid -- how did your paying another ten reduce it?

THE WITNESS:   Well, okay. I had 35 in investments and receivables. So let's say Fair upstreamed it to me, and then I loaned it out. So I owe 35 million back normally, right? Well, I had paid down that loan 10 million to 25. So I actually had more receivables than payables to the company. Does that make sense?

THE COURT:      I don't think it has. I will return it to the questioner, Mr. Covert.

THE WITNESS:    It is confusing.

(Doc. No. 127, at 222-223).


### B. The Agreement Between Client and Attorney

Mr. Durham contends that his agreement with Mr. Tompkins created a conflict of interest that was unconstitutional under Cuyler v. Sullivan, 446 U.S. 335 (1980). Mr. Durham contends that he gave Mr. Tompkins $1 million, from which Mr. Tompkins was to pay litigation expenses (including those for expert witnesses) and keep the change. This, Mr. Durham contends, created exactly the sort of self-vs.-client situation condemned in cases descended from Cuyler.

The actual agreement between Mr. Durham and Mr. Tompkins wasn't quite what Mr. Durham describes: the amount to be spent on litigation expenses was capped. This finding flows partly from credibility determination and partly from simple logic.

The court already explained why Mr. Durham's hearing testimony was lightly credible. By contrast, Mr. Tompkins came across as quite credible. His

memory of events from a decade earlier was reasonably good, but he conceded when he couldn't remember. He also agreed that witnesses who might have been able to contribute something positive to the trial weren't subpoenaed. He gave sound, though occasionally imperfect, reasons for the decisions he made at trial. Mr. Tompkins's credibility far exceeded Mr. Durham's.

Mr. Tompkins disagreed with Mr. Durham about the retention agreement's terms. The evidence supporting Mr. Tompkins's testimony wasn't unassailable: the government presented an engagement letter with Mr. Tompkins's signature, but without Mr. Durham's signature. But Mr. Durham made no suggestion that negotiations toward retention had worked through several drafts; Mr. Durham simply testified that the agreement was what he said it was. Mr. Durham comes out on the short end of credibility disputes with Mr. Tompkins.

Mr. Tompkins's agreement with Mr. Durham, as shown by Government's Exhibit 9, was this:

- Mr. Tompkins would represent Mr. Durham in the pending criminal case for a flat fee.

- Mr. Tompkins would also provide pre-indictment representation for an entity known as Durham Technologies.

- Mr. Durham would pay Mr. Tompkins $1 million for services up to trial, with "trial" defined as the date the final witness list was due, and another $500,000 for everything after that.

- Mr. Tompkins would advance expenses he and Mr. Durham agreed to be necessary and appropriate, up to one-third of Mr. Tompkins's fee — presumably, $333,333.00 up to "trial," and another $166,667 once the "trial" began with the filing of the final witness list.

- The $1-1.5 million fee would apply, as well, to separately billed services for Cell Star, an entity not otherwise identified in the engagement letter (or in the record of the § 2255 hearing). Cell Star's fees would be calculated at $750 per hour, any associate's time would be billed at $250 per hour, and paralegal time would be billed at $150 an hour.

- Mr. Durham was to pay the $1 million within one week of receipt of engagement letter, which was dated July 11, 2011.

The $1 million fee wouldn't be "earned" until the date the defense's final witness list was due. Had Mr. Durham discharged Mr. Tompkins before that, Mr. Tompkins would have had to refund whatever portion of the $1 million that hadn't been earned. Ind. R. Prof. Cond. 1.16(d) ("Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as … refunding any advance payment of fee or expense that has not been earned or incurred…."). Mr. Durham paid the $1 million, thereby accepting the engagement letter's terms. But Mr. Tompkins and he modified those terms almost immediately.

13

Nearly all of Mr. Durham's assets were in bankruptcy, except for $1 million that he had earned through a settlement with National Lampoon. Mr. Durham had been living with his sister, whose husband was a potential witness in Mr. Durham's case. Presiding district judge Jane Magnus-Stinson thought that a sub-optimal living arrangement and gave Mr. Durham a limited array of housing choices. Mr. Durham opted for an apartment—apparently a comfortable one—near Mr. Tompkins's office. Having already given Mr. Tompkins all his worldly assets, Mr. Durham needed money to pay rent. He and Mr. Durham agreed that Mr. Tompkins would "advance" Mr. Durham's first year's lease payments of $50,000. Mr. Tompkins's expense sheet indicates that Mr. Tompkins also paid $47,000 on the next year of Mr. Durham's apartment lease. Mr. Durham testified that he and Mr. Tompkins treated the lease payments as litigation expenses. So shortly after the fee agreement provided that up to a third of a million on litigation expenses, that fund was reduced by $50,000, to $283,333.

In summary, the agreement between Mr. Durham and Mr. Tompkins didn't require Mr. Tompkins to pay unlimited litigation expenses out of the $1 million, though he retained his ethical duty to "provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Ind. R. Prof. Cond. 1.1. The agreement required Mr. Tompkins to pay reasonably necessary litigation expenses up to a total of $333,333.33, or $283,333 after he paid the first year of Mr. Durham's residential lease.

14

IV.   THE C̲U̲Y̲L̲E̲R̲ CONFLICT OF INTEREST CLAIM

The conflict of interest argument draws its vitality from <u>Cuyler v. Sullivan</u>, 446 U.S. 340 (1980), which establishes a separate test for certain ineffective assistance of counsel claims. Mr. Durham makes arguments under both <u>Strickland</u> and <u>Cuyler</u>. He says the failure to call certain witnesses and the failure to effectively cross examine others presents a violation of the standard established in <u>Strickland</u>, and that the financial issues that forced Mr. Tompkins to choose between witnesses and his own compensation presents a violation of the standard established in <u>Cuyler</u>.

Julian Cuyler was one of three separately tried murder defendants, all of whom were represented by the same three attorneys. Mr. Cuyler was the only one of the three to be convicted. The Supreme Court addressed Mr. Cuyler's contention that the attorneys' joint representation of three defendants (joint representation to which Mr. Cuyler hadn't objected at trial) gave rise to an actual conflict of interest among his attorneys, resulting in a denial of his Sixth Amendment right to counsel. <u>Cuyler v. Sullivan</u>, 446 U.S. 340. Mr. Cuyler's attorneys had decided not to present a defense at his trial, in part because they didn't want the prosecutors to have a chance to cross examine witnesses who might testify for the other defendants. The Supreme Court agreed that Mr. Cuyler's attorneys had an actual conflict of interest in trying to use witnesses for one client but not another.

Since the Cuyler decision, courts have identified many other scenarios in which a criminal defense attorney might face an actual conflict of interest, including when the client's interest and the attorney's personal interest misalign. *See, e.g.*, Daniels v. United States, 54 F.3d 290, 294 (7th Cir. 1995) (claim that defendant pleaded guilty only because he couldn't afford to pay the rest of his attorney's fee); Winkler v. Keane, 7 F.3d 304, 308 (2d Cir. 1993) (contingent fee reliant on acquittal was disincentive to seeking plea bargain, but no adverse effect shown). That, Mr. Durham says, is what we have here. Mr. Tompkins had a basket of dollars from which he was to pay for the defense and compensate himself; the less he spent on the defense, the more that would be left to him. And that incentive, Mr. Durham thinks, is why Mr. Tompkins spent too little on experts and investigation.

Perhaps because fee agreements such as this one in this case are common, courts haven't yet embraced Mr. Durham's argument by holding that a flat fee agreement alone creates the sort of conflict envisioned by Cuyler. *See, e.g.*, United States v. Walter-Eze, 869 F.3d 891, 902 (9th 2017) (dicta); Roy v. United States, No. 17-C-5217, 2018 WL 6696598, at *16 (N.D. Ill. Dec. 20, 2018). The Ninth Circuit rejected Mr. Durham's theory altogether. Williams v. Calderon, 52 F.3d 1465, 1473 (9th Cir. 1995) ("All Williams alleges is the same theoretical conflict that exists between an attorney's personal fisc and his client's interests in any pro bono or underfunded appointment case. Such arrangements, without more, do not require Sixth Amendment scrutiny.").

Our court of appeals counseled caution in a state habeas case when facing a similar argument: "lawyers facing such incentives and choices are also motivated by their sense of professional duty and pride, and an interest in their professional reputations, to continue to do good work for a client even if no more money will be paid in the particular case." Reynolds v. Hepp, 902 F.3d 699, 709 (7th Cir. 2018).

Nonetheless, that no fee arrangement has been found to create a Cuyler conflict doesn't mean that none ever can, so the court won't stop its analysis with the caution in Reynolds v. Hepp, *supra*. To prevail on this claim, Mr. Durham must show that Mr. Tompkins was operating under an actual conflict of interest as defined by Cuyler and the cases that followed it, and that the conflict of interest adversely affected Mr. Tompkins's professional performance. Hall v. United States, 371 F.3d 969, 973 (7th Cir. 2004). Mr. Durham hasn't made such a showing.

As the court understands it, Mr. Durham's Cuyler argument addresses the expert witnesses, who would have cost the defense thousands of dollars. At one point in his closing brief, Mr. Durham suggests that witnesses went unsubpoenaed because Mr. Tompkins would have had to spend money to bring them to, and lodge them in, Indianapolis. Not even a whiff of evidence in this record suggests that Mr. Tompkins pinched pennies to that extent. The court will evaluate the Cuyler argument with respect to the expert witnesses, and the Strickland argument with respect to all witnesses.

17

Mr. Durham says he expected Mr. Tompkins to hire a variety of experts: a wiretap expert to support a motion to suppress evidence from the wiretaps; a valuation expert to explain that his companies had more value than the government claimed; and a jury selection expert. It might be helpful to bear in mind, as the court discusses the evidence relating to each of the proposed expert witnesses, that Mr. Tompkins's testified at the § 2255 hearing to his general preferences as a criminal defense attorney: all things being equal, he prefers explanations by lay witnesses (who aren't seen as hired guns) to explanations by expert witnesses, and if there must be expert testimony, he prefers a local expert to experts from far away.

### A. A Document Management Expert: Novus Law

After the government produced discovery on a hard drive, Mr. Durham wanted Mr. Tompkins to hire someone to organize the computer files to make them searchable. Given the formats in which the government provided discovery to the defendants, Mr. Durham says he wanted Mr. Tompkins to hire a firm that provided litigation services, including document and discovery management. Novus Law, LLC, was such a firm. Mr. Tompkins met in August 2011 with Novus Law's chief executive officer, Ray Bayley, to discuss the case and the possible retention of Novus. But Mr. Durham had access to most of the documents on his own computer, and client and attorney were able to search and review that subset of documents. Mr. Tompkins thought they had access

18

to what they needed and didn't retain Novus. He testified that he was able to work through the necessary documents and decided that Novus Law and its six-figure fee weren't necessary.

Mr. Durham suspects the discovery included exculpatory files that the defense simply couldn't unearth. For example, Mr. Durham thinks the decision not to hire Novus Law left Mr. Tompkins unable to use documents to challenge the testimony of Obsidian vice president and senior lender Anthony Schlichte and the testimony of investor Kathleen Studebaker.

There is only speculation about what Novus Law might have found in the discovery material. To hire Novus law would have meant devoting more than a third of the remaining $283,333.00 budgeted for litigation expenses. Mr. Durham hasn't persuaded the court that Mr. Tompkins decided not to hire Novus Law so that he could line his own pockets. There was nothing unreasonable about deciding not to spend a third of the remaining budget to see what might be under the un-turned stones.

*B. A Wiretap Expert*

Government experts monitored several phone lines during the Fair Finance investigation. Those wiretaps, purportedly conducted pursuant to a warrant, produced considerable inculpatory evidence and the search warrants that brought the whole financial complex to a halt. Once the government

produced the wiretap transcripts in discovery, something looked amiss to Mr. Tompkins and Mr. Durham.

Ben Levitan was an expert in wiretapping. Mr. Tompkins retained him as a consulting expert (and paid him $3,500 for the consultation), but not, as Mr. Durham requested, as an expert witness. Mr. Levitan showed Mr. Tompkins how the transcripts showed that the investigators had begun the wiretaps before the warrant had been issued. Mr. Tompkins moved to suppress all of the information from the electronic eavesdropping. As the proceedings developed, the government agreed that it had jumped the gun and that a supporting affidavit had been wrong.

Mr. Tompkins felt it was enough proof that the government admitted in court filings that it had installed taps before the warrant had been issued – which is what Mr. Levitan's testimony would have been used to prove. That was pertinent to Mr. Tompkins's motion to suppress because the agents tapped phones associated with Mr. Durham without a warrant. Judge Magnus-Stinson denied the suppression motion despite the validity of the motion's fundamental premise; it was clear at the § 2255 hearing that Mr. Tompkins still hasn't accepted the justice of that ruling. Mr. Durham suspects, but can't prove that further investigation by Mr. Levitan would have disclosed not only that the government began monitoring phone conversations before getting warrant, but used an unauthorized electronic system, as well.

After four days of evidence, more than a hundred exhibits, more than one hundred pages of petition and briefs, and nearly two days of testimony from Mr. Durham, the court isn't quite sure why Mr. Durham thinks the government used unauthorized equipment. Mr. Durham says he doesn't have to prove what Mr. Levitan would have found through deeper digging, because it's enough under Cuyler that Mr. Tompkins didn't follow up because of his own financial interest and that failure had an adverse effect on the defense and Mr. Tompkins's performance, citing Reynolds v. Hepp, 902 F.3d at 710. But without something to support the proposition that paying Mr. Levitan as an expert witness would have improved the defense's position, the court can find no adverse effect.

Mr. Tompkins got what he needed from his consultation with Mr. Levitan. He was able to prove to the district court that the investigators had conducted electronic surveillance without a warrant. Mr. Levitan's testimony wasn't needed for that. This record doesn't support an inference that Mr. Tompkins passed up a useful expert witness to preserve his future share of the money budgeted for litigation expenses.

### C. Expert Accounting Testimony

#### 1. Scott Risius Ross

Mr. Durham wanted Mr. Tompkins to retain investment banking firm Stout Risius Ross to explain its valuations of the Obsidian companies. He

wanted an expert to oppose the government's contention that the Obsidian companies were grossly overvalued. Mr. Durham had paid Stout Risius Ross $25,000 to review the discounted cash flow valuations that had been prepared by Goelzer Investment Bankers and Somerset CPA,[2] as well as the valuations Mr. Durham and Mr. Snow prepared in November 2009. Mr. Tompkins testified to seeing what he called a "red flag" in the Stout Risius Ross report: "I would have to look at it to know for sure, tens of millions of dollars in losses." (Doc. No. 128, at 363).

Mr. Durham arranged for a conference call between the Stout Risius Ross people, Mr. Tompkins, and himself, but the call never took place. Mr. Tompkins told Mr. Durham that Stout Risius Ross discovered a conflict that meant it couldn't provide an expert. Even though Mr. Tompkins gave co-defendant Rick Snow's attorney the same reason for not calling anyone from Stout Risius Ross, Mr. Durham doesn't believe Mr. Tompkins; he thinks Mr. Tompkins simply didn't want to spend that much money because it would reduce what Mr. Tompkins might make. The court disagrees with Mr. Durham's analysis. Mr. Durham's suspicion doesn't outweigh Mr. Tompkins's testimony that the Scott Risius Ross report had "red flags" of reported losses of "tens of millions of dollars," and that Scott Risius Ross presented a conflict with the defense. The conflict explanation might have been more persuasive if

---

[2] Somerset CPA prepared discounted cash flow valuations for the Obsidian companies for the years 2003-2004. Its services were terminated when it raised questions about the value of Obsidian's loans to Mr. Durham, Mr. Snow, and Obsidian.

anyone could have identified the conflict for the court, but Mr. Tompkins told Mr. Snow's attorney the same thing at the time.

When Scott Risius Ross became unavailable, Mr. Tompkins said the defense could simply have Chris Hirschfield testify about valuation. Mr. Hirschfield, who was expected to testify for the government, worked for an accounting firm called Goelzer Investment Bankers, which prepared discounted cash flow valuations for the Obsidian companies for the year 2005. Mr. Durham says he disagreed with using Mr. Hirschfield because Mr. Hirschfield hadn't been involved in the more important 2009 valuations. So Mr. Durham went in search of another expert. Trial was about two months off by this point.


### 2. Jeff Birk

Mr. Durham's next choice was Jeff Birk, who was Mr. Durham's accountant. Mr. Durham testified that Mr. Birk's testimony that would have been helpful in three or four different areas. For one thing, he said, Mr. Birk could have testified to having advised Mr. Durham to personally assume the related-party loans and write them off on his personal tax return. Mr. Birk prepared financial statements for Mr. Durham, including what were admitted into evidence at the § 2255 hearing as Petitioner's Exhibits 57 (the 2007 financial statement) and 58 (the 2008 financial statement). Mr. Durham conceded that those statements didn't reflect, but should have reflected, the

loans he assumed, but said the statements show that he had enough assets to support the loans.

Mr. Birk wasn't called to testify at trial. The § 2255 hearing record leaves unclear just when Mr. Durham expressed a desire to have Mr. Birk testify. Mr. Durham testified at the § 2255 hearing that Mr. Tompkins told him that: (a) he had subpoenaed Mr. Birk but he didn't appear; and (b) he didn't think Mr. Birk would be helpful. Mr. Tompkins testified that he didn't subpoena Mr. Birk to testify at trial, and couldn't recall what issues Mr. Birk might have been able to address.

Mr. Durham's belief that Mr. Birk's testimony would have been helpful is puzzling. Mr. Birk's firm sent Fair Holdings, Inc. two letters in 2005 about (among other things) the related-party loans and their impact on impairment of the companies' loans and loss reserves. The letters recommended that Fair Holdings retain outside counsel to advise on those issues. The government introduced those letters into evidence at trial, and the letters would have made it difficult for Mr. Birk to say many positive things about the related-party loans that couldn't be impeached on cross examination. Mr. Durham also seemed to believe at the § 2255 hearing that Mr. Birk could have explained how Fair's "subordinate (mezzanine) debt" business model differed from more familiar models, but Mr. Durham also said Mr. Birk's firm didn't understand Fair Finance's model and couldn't quite grasp how Fair Finance was deciding

24

to make the loans in the first place. Mr. Durham explained it this way at the

hearing:

> A     Well, we always had a dispute about the approach. I mean, he always was using the hard assets, and I understand that is a very conservative approach. But I said, you know, we aren't making loans based on assets when we make them. Why would we value them or, you know, test them for reserves on a basis that we didn't use when we made the loan to begin with?

> Q     You are talking about reserves. What exactly are reserves?

> A     Well, when you have a loan to a company, you have to determine if you think the loan is collectible. And if to the extent you don't think that loan is collectible, you need to typically reserve the loan for that amount, giving it – use the example as a house. If you, you know, you buy a house and you have an $80,000 mortgage, and when you bought the house it was worth 100. And then, suddenly the economy falls and it is worth 60, now you have an $80,000 loan covered by a $60,000 asset.

> So you technically should reserve that 20. It hasn't happened yet. You haven't sold the house or missed a payment or anything like that necessarily, but you should reserve on your balance sheet or take a deduction for that amount.

(Doc. No. 127, at 128). When asked later whether Mr. Birk understood

subordinated debt and leveraged buyouts, Mr. Durham answered, "Not so

much." (Doc. No. 128, at 246). That evidence, combined with Mr. Birk's

absence as a witness, a deponent, or even an affiant, at the § 2255 hearing,

leaves the court unable to infer that Mr. Birk's trial testimony would have been

helpful to Mr. Durham. That, in turn, makes it quite unlikely that Mr.

Tompkins decided against calling Mr. Birk so he could claim Mr. Birk's expert

fee for himself – especially since Mr. Tompkins was willing to pay for the next

accounting expert Mr. Durham nominated.

### 3. Houlihan Valuation Advisors: Rob Schlegel

Mr. Durham's search for a valuation expert eventually led to Rob Schlegel of the Houlihan Valuation Advisers firm, and the day before disclosures were due in the criminal case, the defense hired Houlihan. The government objected to the Schlegel designation, but Judge Magnus-Stinson overruled the objection. Houlihan prepared a report on the Fair Finance subsidiaries. That report turned Mr. Durham against having Mr. Schlegel testify: while the report contained many things Mr. Durham liked, he thought the report was incomplete and disagreed with its comments about valuation. Mr. Tompkins testified at the § 2255 hearing that valuation was going to be a difficult issue for the defense, and that he didn't think the Mr. Schlegel's report provided a solid basis to counter the government's valuation evidence. For whatever reason, Mr. Hirshfield became the witness who would provide some evidence that otherwise might have come from an expert witness. There were several points that Mr. Tompkins couldn't make through Mr. Hirschfield, though.

Mr. Tompkins paid Houlihan nearly $30,000 for Mr. Schlegel's work on the case. It might not have been Mr. Durham's objection that kept Mr. Schlegel from testifying for him, but had Mr. Schlegel testified, he would have done so over Mr. Durham's wishes. This record doesn't allow a finding that Mr. Tompkins declined to call Mr. Schlegel as a witness to shift money from his litigation expenses pocket to the pocket in which he kept his own money. Even

if Mr. Tompkins suffered from a <u>Cuyler</u>-like conflict, it didn't affect decisions about Mr. Schlegel.

### D. Expert Testimony About Fair Financial: Jim Covert

Jim Covert is a businessman who has had a remarkable career in and around government, but isn't an accountant. Mr. Covert had looked over Mr. Durham's books after an informal conversation with Mr. Durham after meeting him at a car show. Mr. Durham asked him to look over the books in connection with a refinancing of his company. Mr. Covert was satisfied by what he saw.

Mr. Covert was shocked when Mr. Durham was indicted and called Mr. Durham to offer any help he could provide. Mr. Durham told Mr. Covert that he had retained a famous valuation company and followed its directions. At Mr. Durham's request, Mr. Covert came to Indianapolis and met with Mr. Tompkins, who told Mr. Covert that he wanted Mr. Covert to testify at Mr. Durham's trial. But Mr. Covert never heard from Mr. Tompkins again.

Mr. Tompkins agreed at the § 2255 hearing that Mr. Covert could have told the jury about important matters such as subordinated debt, restrictions on interest payments, extensions of junior debt, and mezzanine debt. But government's trial witness, Anthony Schlichte, discussed all of those matters when Mr. Tompkins cross examined him at trial. Mr. Tompkins explained that he prefers to have fact witnesses explain complicated matters because a retained expert carries the stigma of having been hired by a party for his

opinion. When asked specifically why he didn't call Mr. Covert as a witness, Mr. Tompkins said the defense was structured to explore two veins of reasonable doubt: (1) there were bad assets, but there were enough good ones to make the investment okay, and (2) Mr. Durham and his associates reasonably believed there were enough good assets even if their belief was mistaken. Mr. Covert's testimony wouldn't have advanced either of those lines of argument. Mr. Tompkins testified that he didn't think expert testimony on leveraged buyouts would have been helpful to the jury.

Other than Mr. Durham's use of financing different from what Mr. Covert used, something in the books caught Mr. Covert's attention: the front of the Fair Finance offering circular made reference to cross-investment but didn't give the amount. Mr. Covert asked Mr. Durham about it, and he recounted Mr. Durham's answer at the § 2255 hearing:

> I asked Tim about what the reference was, you know, to, to the financing. And Tim had told me that he was not directly allowed to talk about it, that he had some attorneys that I could call directly if I had questions, and I asked him why. And he said they wanted to make sure that only proper information was given out, and that he didn't want his employees of the company answering.
>
> ***
>
> THE WITNESS: He, he -- I am sorry. He -- Tim had told me that he did not want his employees to answer those questions directly with people because in the past they had made errors in presenting it correctly. And so he told me that he had the name and number I should call if I wanted to talk about it, which I didn't. I never talked to them. But just so you know, that was his position. And that is what I told Mr. Tompkins.

(Doc. No. 129, at 469).

28

Mr. Tompkins had many good reasons not to call Mr. Covert to testify,[3] perhaps most significant among which was Mr. Durham's telling him that even he wasn't allowed to answer Mr. Covert's question about something on the offering circular. And nothing apart from the simple fact of the fee agreement supports the slightest inference that Mr. Tompkins decided not call Mr. Covert because doing so would have reduced his fee.

### E. Conclusion on the Cuyler Claim.

As this review of the decisions not to call any of the experts Mr. Durham proposed shows, there is no evidence (apart from the fee agreement itself) that those decisions were based on anything other than strategy and the best interests of Mr. Durham's case. Not every potential financial edge to an attorney amounts to the sort of actual conflict identified in Cuyler. *See* Mickens v. Taylor, 545 U.S. 162 (2002). Mr. Durham is right that a fee agreement such

---

[3] The government's post-hearing brief offers other reasons a reasonable defense attorney might have chosen not to call Mr. Covert as an expert defense witness. The government's *post hoc* reasons for not calling Mr. Covert are that while Mr. Covert has a stunning resume, he's not a college graduate, has no special training in the field of finance, has little experience in fields other than his own businesses, concedes that he isn't a "great accountant" and relies on "good financial people" in his businesses. Finally, Mr. Durham's petition described Mr. Covert as "a good friend." Mr. Tompkins cited none of these reasons for his decision, but the government points out that a court applying the test of Strickland v. Washington must decide whether an attorney's performance was objectively sub-standard. But this isn't an analysis under Strickland; this is an analysis of whether the fee agreement in this case created an actual conflict for Mr. Tompkins by making him overly frugal with money that would be his if he didn't spend it.

as this might influence an unethical attorney. But as explained in <u>Reynolds v.</u> <u>Hepp</u>, 902 F.3d 699, 709 (7th Cir. 2018), courts can't presume from a fee agreement alone that Mr. Tompkins presented a nickel-and-dime defense to preserve the $1 million dollar fee.

Nothing about the fee arrangement between Mr. Durham and Mr. Tompkins suggests anything sinister. Mr. Durham agreed to pay $1 million up front, understanding that (a) Mr. Tompkins would spend up to a third of it on expenses, including witness expenses, and (b) once the trial started, Mr. Durham was to pay another $500,000. There was nothing unethical about the fee arrangement. *See* Ind. R. Prof. Cond. 1.8(e)(1). The agreement admits of no interpretation that Mr. Durham would be entitled to a partial refund if the expenses fell below a third of a million dollars. Mr. Durham suggests that Mr. Tompkins must have known the additional $500,000 fee was illusory, because the first payment used up all the money Mr. Durham had. Mr. Durham cites no law to support the proposition that a client's expectation of shortchanging his lawyer alters the lawyer's constitutional obligations to the client. And as the government points out, neither of Mr. Durham's co-defendants presented expert testimony, either.

The court rejects Mr. Durham's argument that a conflict of interest caused his trial lawyer to not call expert witnesses, and turns to Mr. Durham's more traditional ineffective assistance of counsel claim under <u>Strickland v.</u> <u>Washington</u>, 466 U.S. 668, 688, 694 (1984).

V.    THE STRICKLAND INEFFECTIVE ASSISTANCE CLAIM

To succeed on an ineffective assistance claim, a petitioner must show both that his attorney's performance "fell below an objective standard of reasonableness" and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). This is a difficult standard to meet. Mr. Durham must show both "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and "that counsel's errors were so serious as to deprive [Mr. Durham] of a fair [result]." Id. at 687. "Stated another way, under the Strickland test, the defendant must show that his counsel's actions were not supported by a reasonable strategy, and that the error was prejudicial." Richardson v. United States, 2021 WL 1165122 at *4 (S.D. Ill. March 26, 2021) (citing Massaro v. United States, 538 U.S. 500, 501 (2003)).

An insufficient showing as to either prong is fatal to a petitioner's claim. Id. at 697; McDaniel v. Polley, 847 F.3d 887, 893 (7th Cir. 2017). The court is required to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland v. Washington, 466 U.S. at 689. "Strickland does not guarantee perfect representation, only a 'reasonably competent attorney.'" Harrington v. Richter, 562 U.S. 86, 109 (2011).

An attorney's constitutional obligation extends to her pretrial work, including reasonable preparation. A failure to do more than minimal pretrial investigation can amount to ineffective assistance of counsel. Failure to investigate more than minimally can amount to deficient performance. Andrus v. Texas, ___ U.S. ___, ___, 140 S. Ct. 1875, 1881-1886 (2020). The attorney must "make reasonable investigations to make a reasonable decision that makes particular investigations unnecessary." Strickland v. Washington, 466 U.S. at 690–691; Meyers v. Gomez, 50 F.4th 628, 642 (7th Cir. 2022) ("without interviewing a witness and determining what precisely she would say on the stand, an attorney cannot assess the witness's strengths and vulnerabilities and make a reasonable professional judgment about the likely impact of the witness's testimony.").

As long as the attorney's trial preparation meets or exceeds constitutional standards, it's generally the attorney's task to decide on the gist of the defense, which witnesses to call, and what cross examination questions are to be asked. Olvera v. Gomez, 2 F.4th 659, 669 (7th Cir. 2021) ("When counsel makes a 'thorough [pretrial] investigation of [the] law and facts,' counsel's trial strategy is 'virtually unchallengeable.'") (quoting Strickland v. Washington, 466 U.S. at 690); Meyers v. Gomez, 50 F.4th at 642 ("When an attorney has looked into a potential defense witness and yet has made a deliberate decision not to present that individual's testimony, then his decision is likely a strategic decision that warrants the greatest degree of deference from

a court."). The attorney's strategic decisions are "not subject to Monday-morning quarterbacking." Atkins v. Zenk, 667 F.3d 939, 945 (7th Cir. 2012).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. at 686.

### A. Fundamental Strategic Disagreements; Witness Erin Beesley

Mr. Durham expected Mr. Tompkins to reduce his caseload to free up time to work on the Durham case, but saw no evidence of Mr. Tompkins having done so. Mr. Tompkins testified at the § 2255 hearing that while he took no fewer new cases, he took less complicated cases to free up time. Mr. Durham simply hasn't proven that Mr. Tompkins' other clients interfered with his ability to prepare Mr. Durham's defense and to prepare for the trial. This record doesn't support a finding that Mr. Tompkins spent less time preparing the case, whether because of other clients or any other reason, than other reasonably competent attorneys would have spent.

Mr. Durham says Mr. Tompkins presented a *mens rea* defense at trial. Mr. Tompkins testified at the § 2255 hearing that there was more than *mens rea* to the defense. He explained that the defense argued a *mens rea* theory – that there was no intent to defraud – but also presented evidence that the

Obsidian companies had enough value to support the loans it was making. Mr. Tompkins's opening and closing statements support that explanation.

In his opening statement, Mr. Tompkins characterized what was happening at Fair Finance in 2009 as not a massive fraud but rather a massive panic because the Ohio Department of Securities was threatening to smother Fair Finance's business. He said that mistakes were made, but mistakes aren't crimes, and neither is pouring one's entire fortune into businesses during terrible financial times. He asked the jury to listen to the wiretap evidence with an ear out for the panic in the voices. Mr. Tompkins's closing argument began by challenging the logic behind the allegations of fraud. Logic would have led to the closing of the Obsidian businesses that were losing money. He spoke of bad decisions not being criminal. Mr. Tompkins argued that the bad decisions and mistakes flowed not from fraud, but from friction between frightened people trying to figure out how to save Fair Finance. He discussed Mr. Durham's use of the depreciated cash flow measure of valuation (noting that Chris Hirschfield called that an accepted valuation method), while the Ohio Department of Securities was using the asset method.

The "assets-were-sufficient" thread of the defense was secondary to the "no-intent-to-defraud" thread. But it was there.

Mr. Durham thinks his defense should have been different, that it should have featured a range of experts and company officers and employees to challenge the very foundation of the government's case by proving that

everything Fair Finance and he were doing was on the up-and-up. Any such defense would have taken jurors on a dizzying trip from one explanation to another.

A good example is found in the testimony Mr. Durham says Mr. Tompkins should have presented through Erin Beesley, who didn't testify at his trial. Ms. Beesley was Obsidian's controller from 2004 to 2007. She prepared a memorandum about how to increase collateral in 2007 (Petitioner's Hearing Exhibit 46) based on information she got from Mr. Durham (through his financial statements) and Mr. Snow. The memorandum reported a shortfall of $8.7 million.

Mr. Durham says he wanted Ms. Beesley as a witness at his trial.[4] In addition to the 2007 memorandum, she prepared a memorandum in May 2006 with a step-by-step approach to reducing the 2005 shortfall. She could have testified that those steps were taken, Mr. Durham says, and that there was no 2005 shortfall by the end of 2006. As Mr. Durham understands it, the companies wouldn't have needed any reserve at all if there was no 2005 shortfall. In reaching her conclusion that the 2005 shortfall could be eliminated in 2006, Ms. Beesley had used elements of Mr. Durham's personal financial statements; on cross examination at the § 2255 hearing, Mr. Durham

---

[4] Mr. Durham says he told Mr. Tompkins that he wanted Ms. Beesley to testify at trial, but he doesn't think Mr. Tompkins served her with a subpoena. Mr. Tompkins didn't remember whether the defense spoke to her. Ms. Beesley testified at the § 2255 hearing that she wasn't subpoenaed to testify at Mr. Durham's criminal trial.

conceded that those statements contained what he called "a mistake," (Doc. No. 127, at 1-195) but it was a doozy of a mistake: the statements omitted $15-20 million in liabilities. It appears that all of Mr. Durham's personal financial statements from that era contained errors.

Ms. Beesley testified at the § 2255 hearing that it was Mr. Durham who told her what shortfall-reducing steps she should put in her memorandum and that she just compiled the information.

Ms. Beesley's proposed testimony highlights a related strategic disagreement between counsel and client. It seems from the § 2255 hearing that Mr. Durham believed that Mr. Tompkins should call every witness that had something helpful to the defense. Mr. Tompkins testified with respect to several witnesses that on balance, the risk of one witness or another outweighed (in his judgment) any help the witness could provide.

Had Mr. Tompkins put Ms. Beesley on the stand in the criminal trial to elicit testimony about the lack of a shortfall at the end of 2006, the cross examination would have disclosed the role Mr. Durham's inaccurate personal financial statements played in the putative lack of a shortfall, giving the government more fodder for argument that Mr. Durham's untrue statements infected all things Fair Finance. Mr. Durham posited explanations about his financial statements at the § 2255 hearing, but it's unclear how Mr. Tompkins might have neutralized the Beesley cross examination at the criminal trial. It

seems far-fetched that a jury would see the omission of more than $15 million of liabilities as "a mistake."

Mr. Tompkins's decision not to put Ms. Beesley on the witness stand falls well within professional norms. Since Mr. Durham told Mr. Tompkins what he wanted Ms. Beesley to testify to, any failure to interview falls within the wide range of reasonable professional assistance. Given the risk of calling Ms. Beesley as a witness, the decision not to call her didn't prejudice the defense case. The failure to call Erin Beesley as trial witness doesn't amount to ineffective assistance of counsel.

### B. Other Witnesses Who Were Not Called

#### 1. Terry Whitesell

Terry Whitesell[5] succeeded Mr. Durham as Fair Finance's vice-president of sales and served as Obsidian's president and chief executive officer. When Fair Finance would take over a company, Mr. Whitesell would be assigned to an operations team.

---

[5] Mr. Durham testified at the § 2255 hearing that Mr. Tompkins told him that the government was threatening Mr. Whitesell as well as prospective witnesses Lagrone, Bontrager, Kuzma, Riggenbach, Brogan, and Schaffter. Mr. Durham's testimony on that point isn't credible, and the court doesn't believe it. It's apparent from a letter Mr. Tompkins wrote in relation to Mr. Durham's subsequent disbarment proceedings that Mr. Durham thought witness intimidation was occurring. But this record doesn't persuade the court that Mr. Tompkins made such statements to Mr. Durham.

Mr. Tompkins testified that he sent an investigator to interview Mr. Whitesell, but that Mr. Whitesell wouldn't talk to the investigator. Mr. Tompkins was sure he reviewed the FBI "302" reports about government interviews with Mr. Whitesell, but couldn't remember at the § 2255 hearing what those reports revealed. Mr. Whitesell denied ever speaking with an investigator. He testified that he only spoke with Mr. Tompkins after the guilty verdict, and then about testifying for Mr. Durham at the sentencing. Mr. Whitesell had signed a proffer agreement with the FBI, but wasn't called as a sentencing witness by either side.

Mr. Durham wanted Mr. Whitesell to testify that the Obsidian businesses, contrary to the government's proof, were doing well enough in 2008-2009 to justify a "really positive" outlook. But Mr. Whitesell also testified at the § 2255 hearing that statements in the Fair offering circular admitted at trial as Government's Exhibit 201 were false, that he had told the FBI that he had been concerned about Obsidian's prospects, that he had stated in another document that business in general was horrible, and that neither he nor a concern called "Durham, Whitesell & Associates" had never received the loan Mr. Durham listed in a document filed with the Ohio Department of Securities as an account receivable of Fair Finance. Mr. Durham couldn't remember, when questioned about at the § 2255 hearing, why "Durham, Whitesell & Associates" was listed as a creditor.

Whether to call a witness generally is a strategic decision left to the attorney. Meyers v. Gomez, 50 F.4th at 642. Given the significant risks to the defense that Mr. Whitesell would have posed if called to testify, Mr. Tompkins's decision not to call him didn't fall below constitutional standards. Nor did the failure to interview him; between Mr. Durham and the FBI "302," Mr. Tompkins knew what he might say.

### 2. Don Lagrone

U.S. Rubber Reclaiming was one of Obsidian's companies. Don Lagrone was U.S. Rubber's president of when the company closed as part of the Fair bankruptcy proceedings. At that point, U.S. Rubber had an eight-figure debt to Fair Finance–at least $11 million. Mr. Durham thought Mr. Lagrone could testify "that, although U.S. Rubber had P&L losses, it didn't have cash flow losses and help explain what that was about. Plus, he could explain the new product we introduced, a crumb rubber product. And he had sent me several e-mails in November of '09 about lots of different things that were happening from a positive point of view at U.S. Rubber." (Doc. No. 127, at 112-113).

Mr. Lagrone didn't testify at Mr. Durham's trial. Mr. Durham asked Mr. Tompkins to call Mr. Lagrone as a witness. Mr. Tompkins recalled speaking to Mr. Lagrone early on, when Mr. Tompkins represented Obsidian. Mr. Lagrone remembered speaking with Mr. Tompkins twice, but couldn't remember specifically what they discussed. Mr. Tompkins recalled that Mr. Lagrone could

testify to some good things, but didn't subpoena him because he viewed Mr. Lagrone as a mixed witness at best. Mr. Tompkins was sure he reviewed the FBI "302"s about interviews with Mr. Lagrone, but couldn't remember at the § 2255 hearing what those reports revealed. Mr. Durham testified at the § 2255 hearing that he had the impression that the government had threatened Mr. Lagrone so that he couldn't testify.

Mr. Lagrone testified at the § 2255 hearing that U.S. Rubber occasionally had trouble with cash flow and secured additional funding from Obsidian, which would obtain the funding from Fair Finance. In 2009, U.S. Rubber was making progress in sales of rubber mulch, but it owed Fair Finance as much as $11 million in late 2008. Mr. Tompkins's performance didn't fall below constitutional standards when he chose not to present a witness to testify to rosy rubber mulch prospects in the face of an eight-figure company debt. That was a "virtually unchallengeable" strategic decision. Olivera v. Gomez, 2 F.4th at 669 (7th Cir. 2021).

### 3.  Todd Bontrager

Todd Bontrager was president of United Express, another of the Obsidian companies. Mr. Durham wanted Mr. Bontrager to testify that United Express had positive future prospects in 2009. Mr. Bontrager testified at the § 2255 hearing that United Express's financial condition worsened in 2008, improved a little bit in 2009, and collapsed when the FBI raided Fair. Mr. Bontrager was

uncertain at the § 2255 hearing whether United Express could service its debt to Fair Finance before the collapse, but he told the FBI that United Express couldn't service its debt to Fair Finance in the 2007-2009 period. Mr. Tompkins testified that he didn't recall what Mr. Bontrager could have testified to; he agrees that he didn't subpoena Mr. Bontrager.

Mr. Bontrager could have testified that every month in 2009 got a little bit better for United Express, but he had already told the FBI that even so, United Express couldn't service its debt to Fair Finance. Mr. Tompkins's decision not to call Mr. Bontrager didn't fall outside the wide range of professional assistance; the decision was strategic to the defense.

### 4. Ron Kaffen

Ron Kaffen was Fair Finance's securities counsel. Mr. Durham told Mr. Tompkins he wanted Mr. Kaffen to testify as to how the Fair Finance investment representatives were trained. Mr. Durham recalls Mr. Tompkins telling him that Mr. Kaffen couldn't testify because he would be in Europe. Mr. Tompkins recalls speaking with Mr. Kaffen by phone once or twice and concluding that Mr. Kaffen wouldn't have positive things to say if he were called as a witness. Mr. Tompkins doesn't recall telling Mr. Durham that Mr. Kaffen would be in Europe during the trial and, given the general credibility of Mr. Durham and Mr. Tompkins, the court doesn't believe that Mr. Tompkins told Mr. Durham that.

Mr. Durham didn't call Mr. Kaffen to testify at the § 2255 hearing, but it's apparent from Mr. Durham's testimony at the hearing that Mr. Kaffen might have cost the defense a great deal had he been called as witness. In Fair Finance's waning days, Mr. Durham wanted Fair Finance to start using a security he devised and called a "temporary certificate." The wiretaps caught Mr. Durham's discussions with Mr. Kaffen about the temporary certificates, which Mr. Kaffen opposed at first, and the trial jury heard at least some of those conversations. Mr. Kaffen also drafted a letter Mr. Durham signed for use as an offering circular; the circular was admitted into evidence at trial, and the best Mr. Durham could call it at the § 2255 hearing was "substantially accurate."

Mr. Kaffen's presence on the witness stand at trial would have offered more benefit to the government than to Mr. Durham, and calling Mr. Kaffen as a witness would likely open the door to other damaging evidence that would undermine the defense. Mr. Tompkins's decision not to call Mr. Kaffen to the stand didn't fall below Sixth Amendment standards.


5.  Keith Kuczma

Keith Kuczma testified at the § 2255 hearing that he joined Fair Finance in June 2009 in sales, and became the investor relations manager, overseeing the people who sold investor certificates to investors and provided investors with offering circulars that explained the certificates and the program. He said

Mr. Durham had no input into investor representative training while Mr. Kuczma worked at Fair Finance. Mr. Kuczma denied that investor reps were ever told to hide the contents of the offering circular.

Mr. Durham wanted Mr. Kuczma to testify at his trial that no one told him to conceal the truth from investors, and that he was to provide investors with the offering circular. Mr. Kuczma testified that he and the investor reps were told in the autumn of 2009 that the State of Ohio's authorization for Fair Finance's offering was expiring at the end of November. Mr. Kuczma and the investors reps assumed the authorization would be renewed. The main Fair Finance offices were raided near the end of November, before the authorization was renewed, so the offices closed.

Mr. Durham told his lawyer that Mr. Kuczma could testify to what investor representatives were and weren't told to say, and that his testimony would show that he and Fair Finance weren't hiding anything. Mr. Kuczma's testimony at the § 2255 hearing didn't quite reach that far: he denied knowing of anyone at Fair Finance telling investor representatives to lie to investors or potential investors. Mr. Kuczma also invested in Fair Finance. Despite his own investment and his reviewing the investment circular with actual and potential investors, Mr. Kuczma didn't know that Mr. Durham was borrowing investor money to pay for his personal expenses.

Mr. Kuczma didn't remember speaking to Mr. Tompkins and wasn't subpoenaed to testify at Mr. Durham's trial. At the § 2255 hearing, Mr.

Tompkins couldn't remember who Mr. Kuczma was, other than that he worked in Ohio.

Had Mr. Kuczma testified at Mr. Durham's criminal trial, he might have been helpful by denying that he never told any investor reps to lie. But the value of that testimony might have been limited by inquiry into how many investor reps Mr. Kuczma actually spoke to. More significantly, he would have testified that he, the person who trained investor reps about what to say about the offering circular and an investor himself, didn't know that Mr. Durham was taking investor money for personal use. That testimony would have badly damaged the defense contention that everything was on the up and up because it was fully disclosed to investors. The decision not to call Mr. Kuczma as a witness falls comfortably within the range of performance of constitutionally competent criminal defense attorneys, and if not, can't be said to have "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. at 686.

6.  Stephany Brogan

Stephany Brogan was a level above Mr. Kuczma on the Fair Finance organizational chart. Mr. Durham testified at the § 2255 hearing that he wanted Ms. Brogan to testify because an undercover FBI agent had discussed Fair Finance's liquidity problems with her in an interview recorded on video.

Mr. Durham also thought she could testify about how the investor reps were trained–specifically, that they weren't told to hide anything.

The FBI agent testified about the videorecorded conversation at trial. The government also called Fair Finance investor relations rep Matt Ogden to testify about instructions given to the reps. Mr. Tompkins testified that Mr. Ogden covered what Mr. Durham hoped to prove through Ms. Brogan. Mr. Tompkins also testified that he and other counsel discussed the Brogan video but thought the risks of unwanted doors being opened outweighed the benefits. Ms. Brogan declined to testify at the § 2255 hearing, leaving the court unwilling to infer that her trial testimony would have been helpful to Mr. Durham.

Mr. Tompkins weighed the risks and benefits of presenting Ms. Brogan as a witness, and decided not to take the risks. Both of the other defendants' attorneys made the same decision. The decision not to call Ms. Brogan to the stand at trial fell well within professional standards.

### 7. Keith Schaffter and Rusty Riggenbach

The court's 2019 ruling allowed Mr. Durham to proceed on his claims that Mr. Tompkins provided constitutionally inadequate representation by not calling Keith Schaffter and Rusty Riggenbach as trial witnesses. The material concerning those witnesses in Mr. Durham's § 2255 petition was less detailed than his description of most witnesses, but in light of the allegations about other witnesses who weren't called, the court gave Mr. Durham a chance to

prove his entitlement to relief based on those witnesses. Mr. Durham didn't meet that burden.

Keith Schaffter was Fair Finance's president. He didn't testify at trial. According to Mr. Durham's § 2255 petition, Mr. Schaffter was involved in email discussions with Keith Kuczma and Mr. Durham about what to do when the Ohio authorization expired. Mr. Schaffter, according to the petition, proposed a statement to be sent to investors explaining the temporary steps Fair Finance would be taking when the authorizations expired. (Doc. 1-7, at 58-59).

Rusty Riggenbach, as Mr. Durham remembers things, preceded Mr. Kuczma as Fair Finance's investor relations manager. In his § 2255 petition, Mr. Durham alleged that Mr. Riggenbach (and Mr. Schaffter) could confirm that none of the defendants – Mr. Durham, Mr. Snow, or Mr. Cochran – told investors not to discuss anything in the investment circular. Mr. Riggenbach reportedly had told the F.B.I. that Mr. Durham and Mr. Cochran weren't involved in the bi-weekly phone calls with the investor representatives. But in the same paragraph of his § 2255 petition, Mr. Durham alleges that Mr. Riggenbach and Mr. Schaffter would have testified that the investor representatives had been trained *not* to discuss details in the offering circular, and to redirect specific questions to Mr. Riggenbach and Mr. Schaffter. He also alleged that Mr. Riggenbach and Mr. Schaffter could have testified to what investor representatives were told to say about the anticipation end of Fair Finance's authorization. (Doc. 1-7, at 97-98). Mr. Tompkins didn't call Mr.

Riggenbach as a trial witness, and couldn't remember Mr. Riggenbach at all while testifying at the § 2255 hearing.

Mr. Schaffter passed away between the trial and the § 2255 hearing. Mr. Riggenbach didn't testify at the § 2255 hearing. Mr. Durham testified at the § 2255 hearing that he wanted four Fair Finance employees to testify at his trial:

> I told them that Keith Kuczma, who was head of investor relations during the November time frame when we were trying to get our renewed authorization, and he would have been important to, you know, about what the investor reps that worked for him were told to do and not to do because he did it and that we weren't concealing anything. And then, Rusty Riggenbach was the investor relations manager prior to Keith, and he could have also disclosed that we actually were not hiding the fact that Fair was having liquidity challenges during the recession. And then, the third one that I really wanted him to get was Stephanie Brogan because she was interviewed by an FBI agent, and she literally is on video talking about the liquidity problems.
>
> Q    And Mr. Schaffter?
>
> A    Yeah. He was president of Fair at the time too, and he could have, of course, addressed the same time frames and the same issues.

(Doc. 127 at 116). Mr. Durham testified that Mr. Tompkins told him they didn't testify because the government was intimidating them. As already noted, *see* note 5 *supra*, the court doesn't credit Mr. Durham's testimony about Mr. Tompkins saying the government was intimidating potential witnesses. Mr. Tompkins had no recollection of either Mr. Riggenbach or Mr. Schaffter when he testified at the § 2255 hearing. Mr. Kuczma had no recollection of Mr. Schaffter in his testimony, either.

As was discussed in relation to Mr. Kuczma's potential testimony, Mr. Riggenbach and Mr. Schaffter could have testified to what they told (or didn't

tell) the investor representatives, but what anyone else might have told them would be outside their personal knowledge. Mr. Durham's thin showing of what Mr. Riggenbach and Mr. Schaffter might have contributed as witnesses doesn't establish that Mr. Tompkins's decisions not to call either fell below an objective standard of reasonableness. Similarly, Mr. Durham's thin showing with respect to these two potential witnesses doesn't persuade the court that the decision not to call either had any impact on the outcome of the trial.

### C. Cross Examination of Government Witnesses

#### 1. Anthony Schlichte

Anthony Schlichte was Obsidian's chief financial officer, vice president in charge of corporate finance, and senior lender. He worked in commercial banking for 25 years and ran U.S. Rubber for a time. Mr. Schlichte was a government witness at the criminal trial. Mr. Durham believes Mr. Tompkins's cross examination of Mr. Schlichte fell below the standard set in Strickland.

At the criminal trial, Mr. Schlichte explained the corporate connections and identified the officers of Obsidian and Fair Finance and the subsidiary corporations. He explained how the money would go from Fair Finance to Fair Holdings to Obsidian (sometimes going to Obsidian through DC Investments) and on to subsidiaries by way of transactions that looked something like loans. Mr. Schlichte testified that Fair Finance would continue to fund Obsidian and subsidiaries even when loan repayments weren't made. He explained that

although Fair Finance had submitted an evaluation of Obsidian subsidiary Classic Manufacturing to the Ohio Department of Securities on November 1, 2009, showing a valuation of $4.9 million, Classic had ceased operations by that date and the senior lender hadn't been paid in full.

Mr. Schlichte testified to having sent Mr. Durham and Mr. Whitesell what he called a "sobering assessment" of U.S. Rubber's viability in August 2006, in which he recommended consideration of a quick shutdown and/or liquidation. Mr. Schlichte testified that he got no response from Mr. Durham. He went on to relate receipt of an offer for U.S. Rubber from Indian business in September 2009 (by which time U.S. Rubber's condition hadn't improved much). Mr. Schlichte had tried to solicit an offer from the Indian business, and got an offer to buy "the complete business and assets of" U.S. Rubber for $1.5 million plus an undetermined amount for its working capital, though no debt would be assumed. (1:11-cr-00042, Doc. No. 372, at 136). Mr. Schlichte testified that, at that point, U.S. Rubber owed Fair Finance more than $10 million and owed bank loans of three to four million dollars. Mr. Schlichte testified that in a November 1, 2009 submission to the Ohio Department of Securities, Fair Finance reported that U.S. Rubber's equipment value was $14,552,470, a figure with which Mr. Schlichte disagreed. That submission reported an enterprise value of $20,283,000 and an enterprise equity value (after subtracting debt) of $2,462,000. Mr. Schlichte conceded from the witness stand that he, too, had received loans from Mr. Durham and DC Investments. He said he stopped making payments on the loans in May 2008.

Mr. Tompkins remembered Mr. Schlichte as an important witness for the government. Mr. Tompkins impeached Mr. Schlichte with his prior statements (as reported by the FBI in a "302") about U.S. Rubber's profitability and cash flow, and used Mr. Schlichte's cross examination to bring out some of the things Mr. Durham wanted Mr. Covert to testify to, such as explanations of junior lenders and mezzanine debt. The cross examination also explained that at some time – maybe when Fair Finances made its representations to the Ohio Department of Securities, consideration was being given to merging Classic with United.

Mr. Schlichte testified at the § 2255 hearing that Petitioner's Exhibit 71, which purported to show that Obsidian and each of the related companies had positive "EBITDAs"[6] in 2005 and 2006, weren't a complete picture because they didn't reflect money owed to the senior lenders.

Mr. Durham contends that Mr. Tompkins provided ineffective assistance of counsel when cross examining Mr. Schlichte. As Mr. Durham recalls it, Mr. Schlichte testified at trial that the offer to purchase U.S. Rubber was for $1.5 million. Mr. Durham says the offer was actually $1.5 million, plus "working capital," which consists of accounts receivable, inventory, and cash on hand. He says U.S. Rubber's working capital amounted to $8-9 million, so the offer

---

[6] "EBIDTA" stands for earnings before interest, taxes. depreciation and amortization. It produces a measure of a company's financial condition and cash-generating ability.

was really $10.5 million. Mr. Durham says he told Mr. Tompkins about the omission at trial.

The trial transcript doesn't fully support Mr. Durham's memory that Mr. Schlichte's trial testimony elided the offer for the working capital. At the government's direction, Mr. Schlichte read from Government's Trial Exhibit 427, the operative part of the offer to the jury and into the record:

> A    We have had the opportunity to peruse all the data that was sent to us, and based on our internal deliberations and analysis, we shall, at best, be able to offer Obsidian U.S. dollars, one and a half million dollars for the complete business and assets of United States Rubber. We shall also offer value for the working capital, which we believe shall be appropriate for the level of business which we shall ascertain after due diligence. We would not take over any debt, and as indicated by you, except that there shall not be any retirement or other liabilities which shall potentially reduce the offer price to that extent.
>
> Q    And so, why is it – could you tell us the amount? What amount are they offering to purchase U.S. Rubber for?
>
> A    A million and a half dollars.

(1:11-cr-00042, Doc. No. 372, at 135-136).

Mr. Durham also says that Mr. Tompkins should have established on cross examination that the government threatened to prosecute Mr. Schlichte if he didn't testify against Mr. Durham. But at the § 2255 hearing, Mr. Schlichte denied fearing prosecution for not testifying.

Mr. Tompkins's performance in cross examining Mr. Schlichte didn't fall below what would be expected of a competent criminal attorney. Had Mr. Tompkins engaged Mr. Schlichte on the offer for U.S. Rubber, he would have enabled Mr. Schlichte to opine that U.S. Rubber's working capital, which had

no dollar value in the offer, was far less than the $8-9 million that Mr. Durham assigns. Mr. Durham's attorneys didn't ask Mr. Schlichte for such an opinion at the § 2255 hearing. And in any event, the "working capital" component of the Indian business's offer was in evidence (and had been read to the jury), so if it acquired any particular significance, Mr. Tompkins could have pointed it out during final argument. There was no reason to ask a cross examination question about the dollar value of the offer.

## 2.  Ben Kimmerling

Fair Holdings hired Somerset CPA in 2005 to conduct an audit of Fair Financial for the years 2003-2004. Somerset's predecessor accounting firm had concluded that there was a need for additional reserve on Fair Finance's loans. Ben Kimmerling, Somerset's president,[7] testified at trial for the government that Somerset completed its audits for 2003 and 2004, but never completed the 2005 audit because of there was too little documentation and information about, among things, analysis of loan collateral and related party loans. Mr. Durham had pledged his personal assets to make up any shortfall in the loan collateral, but Somerset thought he was using up those assets by repaying others' loans. In 2006, Somerset found a shortfall of $22.7 million after accounting for the companies' collateral and what Mr. Durham could add. Somerset also calculated the related parties' loans at $88 million.

---

[7] Mr. Durham seemed to refer to Mr. Kimmerling and Somerset interchangeably in the § 2255 proceedings.

Given the issues about the collateral, the reserves, and the related party loans, Somerset concluded that it couldn't issue an audit report for the calendar year 2005 that would comply with accounting principles. Unless Fair Holdings set aside another $20 million reserve to cover the reported party loans and consolidating Obsidian and perhaps other entities with substantial loans into the Fair Holdings audit[8] (which would require past audits of the consolidated entities). Discussions of a consolidation of Fair Holdings, Fair Finance and DC Investments into a single audit indicated that the four entities together – including Obsidian – were losing more $20 million. That information led Somerset to revoke its consent for Fair Holdings' further use of Somerset's 2003 and 2004 audit reports.

On cross examination, Mr. Tompkins questioned Mr. Kimmerling about Somerset's discussions with Fair Holdings' previous accountant. His cross examination established that Somerset found no signs of fraud, that the 2003 and 2004 audit report was unqualified, that Mr. Durham agreed to provide more collateral when he was asked to, that the Somerset firm didn't use a cash flow method rather than looking just at hard assets in its audit (though that is a valid method), and that Fair Holdings did nothing improper in its response to Somerset's request for past audits of the entities to be consolidated.

Mr. Durham says that Mr. Tompkins should have asked on cross examination about "the discounted cash flows [Somerset did] for us in '06, '07,

---

[8] This was considered necessary due to then-new adoption of an accounting standard call "FIN 46" at the trial and the § 2255 hearing.

and '08 for several of the companies" (Doc. No. 127, at 130) and explain noncash, nonrecurring losses which, Mr. Durham believed, would have put the associated companies' financial situations in a better light. When he explained the need for Mr. Kimmerling's testimony at the § 2255 hearing, Mr. Durham said that Somerset's use of an accounting standard called "FIN 46" would have required the consolidation of many of Fair Holding's subsidiaries. That would require audits of companies that hadn't needed auditing before, making a historical audit difficult and expensive. Mr. Durham said that no audit was done because the issue arose around the same time as "the other collateral issue they brought up." (Doc. No. 127, at 133).

The jury saw and heard the correspondence between (among others) Mr. Kimmerling and Mr. Snow that discussed what would be required for a consolidated audit and why Fair Holdings decided against it. Mr. Kimmerling wasn't asked at the § 2255 hearing about discounted cash flows or noncash, nonrecurring losses, so the court can't know what Mr. Kimmerling might have said had Mr. Tompkins raised the issues on cross examination at trial. Without that information, no court could conclude that Mr. Tompkins's cross examination of Mr. Kimmerling fell outside the wide range of professional conduct that passes constitutional muster.

### D. Conclusion on *Strickland* Claim

Mr. Durham hasn't shown that Mr. Tompkins's performance fell below constitutional standards at any point in the trial or the time leading up to trial with respect to contacting, interviewing, questioning, calling to testify, or cross examining witnesses.

### VI.   CONCLUSION ON § 2255 PETITION

Mr. Durham hasn't shown entitlement to relief under either of the theories on which the evidentiary hearing was conducted, and the court previously dismissed his other claims. The court DENIES his petition for relief under 28 U.S.C. § 2255.

SO ORDERED.

ENTERED:  December 5, 2022

/s/ Robert L. Miller, Jr.
Robert L. Miller, Jr., Judge

United States District Court

Distribution to all counsel of record via CM/ECF